No. 15-2043

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

———————————————

PERFECT SURGICAL TECHNIQUES, INC.,
Appellant,

v.

OLYMPUS AMERICA, INC. and
OLYMPUS MEDICAL SYSTEMS CORPORTATION,
Appellees.

———————————————

On Appeal From the United States Patent and Trademark Office
Before The Patent Trial and Appeal Board
Case IPR2014-00233

———————————————

## APPELLANT'S OPENING BRIEF

———————————————

Robert E. Freitas
Daniel J. Weinberg
Joshua L. Young
FREITAS ANGELL & WEINBERG LLP
350 Marine Parkway, Suite 200
Redwood Shores, California  94065
Telephone:   (650) 593-6300
Facsimile:   (650) 593-6301

Attorneys for Appellant
Perfect Surgical Techniques, Inc.

## CERTIFICATE OF INTEREST

Counsel for Appellant Perfect Surgical Techniques, Inc. ("PST") certifies the following:

1.    The full name of every party or amicus represented by me is:

Perfect Surgical Techniques, Inc.

2.    The name of the real party in interest represented by me is:

N/A

3.    All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

N/A

4.    The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

Robert E. Freitas
Jason S. Angell
Daniel J. Weinberg
Joshua L. Young
FREITAS ANGELL & WEINBERG LLP
350 Marine Parkway, Suite 200
Redwood Shores, CA 94065
Telephone: (650) 593-6300
Facsimile: (650) 593-6301
rfreitas@fawlaw.com
jangell@fawlaw.com
dweinberg@fawlaw.com
jyoung@fawlaw.com

# TABLE OF CONTENTS

**Page**

STATEMENT OF RELATED CASES ...................................................1

JURISDICTIONAL STATEMENT ......................................................1

STATEMENT OF THE ISSUES..........................................................1

STATEMENT OF THE CASE.............................................................2

STATEMENT OF FACTS ..................................................................3

SUMMARY OF THE ARGUMENT ..................................................11

ARGUMENT ...................................................................................15

I.     STANDARD OF REVIEW ....................................................15

II.    DR. NEZHAT CONCEIVED THE '384 INVENTION BEFORE THE
       PUBLICATION OF JP '551 AND HE AND MR. HESLIN WERE
       REASONABLY DILIGENT IN REDUCING THE INVENTION TO
       PRACTICE DURING THE CRITICAL PERIOD .....................................16

       A.    Dr. Nezhat Conceived The Invention Of The '384 Patent Before
             February 10, 1998..............................................................18

       B.    Dr. Nezhat And Mr. Heslin Continuously Exercised Reasonable
             Diligence From February 9, 1998 To May 1, 1998 ..........................20

III.   THE BOARD'S FAILURE TO CONSIDER ALL OF THE
       EVIDENCE REQUIRES REVERSAL.....................................................26

       A.    The Board Acknowledged That It Did Not Consider Evidence
             of Mr. Heslin's Activities During The Critical Period.......................27

       B.    The Board Wrongly Focused On Isolated Intervals, Rather
             Than the Entire Critical Period............................................31

       C.    The Board Applied An Erroneous Standard To The Evidence
             Of Diligent Pursuit Of The Application.............................38

# TABLE OF CONTENTS
(continued)

**Page**

IV.   JP '551 SHOULD NOT HAVE BEEN CONSIDERED BY THE
BOARD AND THERE WAS NO EVIDENCE TO ESTABLISH THE
PRIORITY DATE OF JP '551 ................................................................ 41

V.   THE BOARD'S IMPROPER CONSTRUCTION OF THE TERM
"PERFORATED" RESULTED IN AN INCORRECT FINDING OF
UNPATENTABILITY ................................................................................ 46

VI.   CONCLUSION ............................................................................................ 50

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Arlington Indus., Inc. v. Bridgeport Fittings, Inc.*,
   632 F.3d 1246 (Fed. Cir. 2011) ..........................................................................16

*Brown v. Barbacid*,
   276 F.3d 1327 (Fed. Cir. 2002) ..........................................................................15

*Brown v. Barbacid*,
   436 F.3d 1376 (Fed. Cir.2006) ..............................................................21, 39, 40

*Burroughs Wellcome Co. v. Barr Labs, Inc.*,
   40 F.3d 1223 (Fed. Cir. 1994) ............................................................................18

*In re Enhanced Sec. Research, LLC*,
   739 F.3d 1347 (Fed. Cir. 2014) ....................................................................28, 30

*In re Garner*,
   508 F.3d 1376 (Fed. Cir. 2007) ..........................................................................16

*In re Gartside*,
   203 F.3d 1305 (Fed.Cir.2000) ............................................................................15

*Ireland v. Smith*,
   97 F.2d 95 (C.C.P.A. 1938) ................................................................................32

*Jones v. Evans*,
   46 F.2d 197 (C.C.P.A. 1931) ..................................................................37, 38, 39

*K&K Jump Start/Chargers, Inc. v. Schumacher Elec. Corp.*,
   52 F. App'x 135 (Fed. Cir. 2002) ................................................................31, 33

*Loral Fairchild Corp. v. Matsushita Elec.*,
   266 F.3d 1358 (Fed. Cir. 2001) ..........................................................................19

*Mahurkar v. C.R. Bard, Inc.*,
   79 F.3d 1572 (Fed. Cir. 1996) ....................................................................17, 19

*Microsoft Corp. v. Proxyconn, Inc.*,
   789 F.3d 1292 (Fed. Cir. 2015) ..........................................................................49

*Monsanto Co. v. Mycogen Plant Sci., Inc.*,
261 F.3d 1356 (Fed. Cir. 2001) .................................................................17, 31

*Morway v. Bondi*,
203 F.2d 742 (C.C.P.A. 1953) ...........................................................................32

*In re Mulder*
716 F.2d 1542 (Fed. Cir. 1983) ........................................................................32

*Phillips v. AWH Corp.*,
415 F.3d 1303 (Fed.Cir.2005) (*en banc*) ...........................................................48

*Price v. Symsek*,
988 F.2d 1187 (Fed.Cir.1993) ...............................................................*passim*

*Rines v. Morgan*,
45 C.C.P.A. 743 (1957) .............................................................................21, 31

*Round Rock Research, LLC v. Sandisk Corp.*,
81 F. Supp. 3d 339, 348-49 (D. Del. 2015) ...............................................19, 21

*Singh v. Brake*,
317 F.3d 1334 (Fed. Cir. 2003) ........................................................................17

*In re Skvorecz*,
580 F.3d 1262 (Fed. Cir. 2009) ........................................................................49

*Spansion, Inc. v. Int'l Trade Comm'n*,
629 F.3d 1331 (Fed. Cir. 2010) ........................................................................18

*In re Steed*,
802 F.3d 1311 (Fed. Cir. 2015) .................................................................15, 34

*In re Sullivan*,
362 F.3d 1324 (Fed. Cir. 2004) ........................................................................16

*SuperGuide Corp. v. DirecTV Enterprises, Inc.*,
358 F.3d 870 (Fed. Cir. 2004) .........................................................................48

*Thorner v. Sony Computer Entm't Am. LLC*,
669 F.3d 1362 (Fed. Cir. 2012) ........................................................................47

*Zhongshan Broad Ocean Motor Co., Ltd., Broad Ocean Motor LLC,*
   *& Broad Ocean Techs., LLC, Petitioners,*
   IPR2014-01121, 2015 WL 5452785 (Jan. 21, 2015) ...................................44, 45


**Federal Statutes**

5 U.S.C. § 706(2)(A)...............................................................................16

18 U.S.C. § 1001 .....................................................................................43

28 U.S.C. §1746.......................................................................................42

35 U.S.C. § 102(a) ..................................................................................16

35 U.S.C. § 102(g) ..................................................................................17

**Regulations**

37 C.F.R. 42.53(a)...................................................................................42

37 C.F.R. §1.68 .......................................................................................43

37 C.F.R. § 42.63 ....................................................................................11

37 C.F.R. § 42.63(b) ..........................................................................*passim*

37 C.F.R. § 42.100(b) .............................................................................46

**Other Authorities**

Manual of Patent Examining Procedure ..................................................44

## STATEMENT OF RELATED CASES

U.S. Patent No. 6,030,384 ("'384 patent") is also the subject of the following district court case: *Perfect Surgical Techniques, Inc. v. Olympus America Inc., Gyrus Medical, Inc.,* and *Gyrus ACMI, Inc.*, Case No. 4:12-cv-05967-PJH (N.D. Cal.).

PST is aware of no other related cases.

## JURISDICTIONAL STATEMENT

The Patent Trial and Appeal Board ("Board") had jurisdiction over Olympus America, Inc. and Olympus Medical Systems Corporation's (collectively, "Olympus") petition under 35 U.S.C. § 6. Olympus filed a petition for *inter partes* review of the '384 patent. A55. The Board issued a final written decision on June 8, 2015. A2. PST timely filed its notice of appeal on August 4, 2015. 35 U.S.C. § 329. This Court has jurisdiction under 28 U.S.C. § 1295(a)(4)(A).

## STATEMENT OF THE ISSUES

Whether the Board erred in finding that the inventor failed to exercise reasonable diligence in constructively reducing to practice the invention of the '384 patent during the critical period.

Whether the Board's consideration of a partially translated foreign prior art reference was appropriate under 37 C.F.R. § 42.63(b).

Whether Olympus proved that claims 1, 4-6, 8, 9, 11, 12, 38, 41-44, 46, 47,

and 49 are unpatentable under 35 U.S.C. § 102(b) or 103(a) over Japanese

Application Publication No. JP H10-33551 A.

## STATEMENT OF THE CASE

On December 20, 2013 Olympus filed a corrected petition requesting *inter*

*partes* review of claims 1, 4-6, 8-9, 11-12, 38, 41-44, 46-47, and 49 of the '384

patent.  A41.  On June 16, 2014, the Board instituted *inter partes* review on three

grounds:

On the theory that claims 1, 4-6, 8, 9, 11, 12, 38, 41-44, 46, 47, and 49 were

anticipated by Japanese Application Publication No. JP H10-33551 A ("JP '551").

On the theory that claims 1, 4-6, 8, 9, 11, 12, 38, 41-44, 46, 47, and 49

would have been obvious over JP '551.

On the theory that claims 1, 4-6, 8, 9, 11-12, 43, 44, 46, and 47 would have

been obvious over JP '551 and French Patent No. FR 598,149 ("FR '149").

A479.

PST filed a patent owner response accompanied by the declarations of Dr.

Camran Nezhat, James Heslin, Jee Shin, Florence Leto, and  expert witness Dr.

Robert Tucker.

 Olympus replied.  *See* A931.  PST also filed a motion to exclude evidence.

*See* A1722. PST's motion was opposed.  *See* A1748.

Oral hearing was held on February 23, 2015.  On June 8, 2015, the Board

issued a final written decision, in which it determined that Olympus had shown by

a preponderance of the evidence that claims 1, 4-6, 8, 9, 11, 12, 38, 41-44, 46, 47,

and 49 of the '384 patent were anticipated by, and obvious over, JP '551.  A46.

The Board also determined that Olympus had shown by a preponderance of the

evidence that claims 1, 4-6, 8, 9, 11-12, 43, 44, 46, and 47 would have been

obvious over JP '551 and FR '149.  *Id.*  The Board denied PST's motion to exclude

evidence as untimely filed, but nevertheless expunged *sua sponte* Exhibits 1024-

1028.  *Id.*

## STATEMENT OF FACTS

### Inventor Dr. Camran Nezhat.

Dr. Camran Nezhat, the inventor of the '384 patent, has been called the

"Father of Modern Operative Laparoscopy."  A693.  Laparoscopy is a minimally

invasive surgical technique that utilizes small incisions and thin tools to improve

outcomes and shorten recovery times for patients.  As a laparoscopic surgeon, with

a sub-speciality in reproductive endocrinology and infertility, Dr. Nezhat has been

lauded for his contributions as a surgeon, teacher, author, researcher, and inventor.

A666, ¶2.

Since beginning to practice medicine in 1980, Dr. Nezhat has dedicated his

life to improving the lives of his patients.  *See* A667, ¶6; A1209:2-5.  This

commitment has included designing novel laparoscopic instruments.  *See*

A1203:14-16 ("[B]ecause of my experience, I try to develop something to make things easier."). One problem encountered in Dr. Nezhat's medical practice involved the overheating of human tissue during various laparoscopic procedures such as endometrial ablation, a surgery pioneered by Dr. Nezhat, and one that he frequently performs. A1331:12-14.

Endometrial ablation surgically destroys the endometrial lining of the uterus, with the goal of reducing excessive menstrual flow. *See* A1313, 7-8; A1332:24-A1333:5. To remove the tissue growing inside the uterus, Dr. Nezhat used instruments that applied an electrical current to the tips of bipolar forceps thereby heating and cutting away the tissue grasped by the forceps. *See* A1334:9-A1335:1. Before the conception of the invention at issue in this case, the primary tool laparoscopic surgeons used to cut tissues inside the body was the Kleppinger grasping forceps. *See id*. The Kleppinger forceps used electricity to heat tissue to the point at which it becomes coagulated and/or necrosed. *Id*. Problematically, the Kleppinger forceps focused energy, at best, over a 5-6 millimeter area, an area large enough to impact healthy tissue. A1335:4-7. Additionally, the outside of the Kleppinger forceps would become extremely hot during the procedure, thereby increasing the chances of accidental tissue damage. *Id*.

**Dr. Nezhat's Conception Of The Invention Of The'384 Patent.**

Dr. Nezhat often pondered a way to improve the Kleppinger forceps:

> How could we make it safer? How could we make
> women I help they want to have children, and they have a
> lot of pain with their period, and endometriosis. So I like
> to see how we could create the least amount of damage to
> the adjacent organs.

A1312:5-11.

Beginning as early as 1996, Dr. Nezhat began to conceive an idea that would

minimize the outward spread of heat in electrosurgery by placing positive and

negative electrodes in positions on forceps to focus the electric charge more

precisely. *Id.*; A125 (2:13-16). One such configuration laterally spaced the

electrode members on either or both of the jaws to prevent current flow outside of

the region between the electrodes. A125 (2:21-22).

Dr. Nezhat's invention also included tissue penetrating elements. *Id.* at

2:29-30. When configured to align, the tissue penetrating elements enable the

electrical current to be focused with minimal heating of tissue outside of the

treatment region. *Id.* at 2:49-54 ("By then applying high frequency electrical

energy to the lines in a bipolar manner, current flux will be focused to within that

portion of the tissue which lies between the adjacent lines, with minimum heating

of tissue outside of the parallel lines.").

While the Kleppinger forceps applied energy over a 5-6 millimeter area, the

forceps of the '384 invention was far more precise, capable of applying energy

over an area limited to 1-2 millimeters. A1335:3-7. Additionally, unlike the

Kleppinger forceps, the outside of the '384 forceps remained cool during operation and was thus safer. *Id.*

Dr. Nezhat, with assistance from his business partner, Tsaba Truckai, created a series of drawings depicting Dr. Nezhat's invention. The drawings were attached to a laboratory notebook, and the pages of the notebook were subsequently signed and dated by various individuals, including Dr. Nezhat's brother, a colleague at Stanford Hospital, Mr. Truckai, and a venture capitalist who worked with Dr. Nezhat.

**The Process That Led To The Application That Resulted In The '384 Patent.**

Dr. Nezhat was encouraged by his Stanford University colleagues to seek patent protection for his invention. *See* A1339:7-9; A1340:8-13. As a first step, Dr. Nezhat hired attorney James Heslin, in March 1997. The two met while Dr. Nezhat was advising a company developing minimally invasive heart surgery techniques, for which Mr. Heslin served as patent counsel. A1506:15-1507:4. Mr. Heslin was a well-known patent attorney specializing in medical device patents with the intellectual property law firm Townsend & Townsend & Crew LLP. A669, ¶ 10.

From the start of the representation, including when Mr. Heslin sent Dr. Nezhat the first draft of the application that would become the '384 patent on January 28, 1998, up to the filing of the application on May 1, 1998, Dr. Nezhat

had regular communication with Mr. Heslin.  A1259:24-1260:4.  In describing his
working relationship with Mr. Heslin throughout the drafting process, Dr. Nezhat
characterized Mr. Heslin as "very picking" [*sic*] and said he asked many questions,
which required Dr. Nezhat to go "back and forth and bring him things" and have
"many conversations."  A1260:2-1261:8; A1261:13-14.  Mr. Heslin, in turn,
described Dr. Nezhat as "a careful and serious client who despite his own active
medical practice took the time to closely study and understand the draft claims and
provide meaningful and useful feedback to me."  A1549:1-5.

During the development of the patent application, both men maintained
robust professional lives.  Throughout 1998, Dr. Nezhat had an active surgery and
consultative practice.  His schedule in early 1998 was typical of his usual medical
practice and included performing approximately four to six surgeries per week,
with at least one or more surgeries occurring on each day.  A686, ¶ 12.  When Dr.
Nezhat was not in surgery, he was either meeting with patients or teaching
students.  *Id.*  Dr. Nezhat worked an average of 80 hours each week.  *Id.*  In 1998,
Dr. Nezhat also published ten peer-reviewed papers, A699-700, wrote four medical
text book chapters, A713, gave three guest lectures in Italy, A739, and performed a
surgical demonstration at a conference in Georgia, A728.

Meanwhile, Mr. Heslin, conducted his own busy practice as founder and
leader of the medical device technology patent group at the Townsend firm.  A755,

¶ 2.  Mr. Heslin represented numerous clients in various aspects of managing and protecting their intellectual property, and had a full docket of matters that regularly required him to work 50 hours a week or more.  A756, ¶6.

In 1998, it was Mr. Heslin's usual practice to dictate the text of whatever he was drafting, and send what he dictated to his secretary or his firm's word processing department for transcription.  A1528:13-20.  It would be common that several days, sometimes as many as eight, would elapse before a completed transcription would be prepared.  *Id*. at 1-12.

**The Preparation of the Initial and Subsequent Drafts of the Patent Application.**

On January 29, 1998, Mr. Heslin finalized the initial draft of the application that lead to the issuance of the '384 patent, and forwarded the draft along with a letter dated January 28, 1998 to Dr. Nezhat.  *See* A579-596.  Excerpts from this initial draft, as well as several pages of Dr. Nezhat's laboratory notebook, closely mirror claims 1, 4-6, 8-9, 11-12, 38, 41-44, 46-47, and 49 of the '384 patent.  A669-686.

While carrying out his busy medical practice, Dr. Nezhat carefully reviewed the draft application and endeavored to work with Mr. Heslin to define the scope of his inventions for the patent.  A686-687, ¶ 14.  At deposition, Dr. Nezhat remembered that during this period, "[Mr. Heslin] would ask me to do something on his patent application.  It says, comment on this, comment on that, fix this, what

-8-

is that.  So I had to go and research it and come up with the answer with my work.

An [*sic*] of course you remember I have many other things to do too, so in between

I would find out and I'd communicate back to him." A1305:7-14.  According to

Mr. Heslin, Dr. Nezhat was a "careful and serious" client who took the time to

study the application closely, understand the draft claims, and provide meaningful

and useful feedback.  A758-759, ¶ 13; A1549:1-5.

On March 2, 1998, Dr. Nezhat faxed his comments on the initial draft to Mr.

Heslin.  A927 (March 12 fax thanking Dr. Nezhat for his March 2 fax), A686-687,

¶ 14.

On or about March 4, 1998, Mr. Heslin prepared a series of questions to Dr.

Nezhat regarding the application.  After the questions were transcribed, Mr. Heslin

sent them to Dr. Nezhat on Thursday, March 12, 1998.  Immediately after the

weekend, on Monday, March 16, Mr. Heslin met in person with Dr. Nezhat and

Mr. Truckai, to discuss the draft patent application.  A687, ¶ 15.

Mr. Heslin's attorney billing records show that on April 7, 1998, Mr. Heslin

made further revisions to the patent application, A758, ¶ 11, and on April 13, 1998,

Mr. Heslin transmitted the revised draft of the application to Dr. Nezhat.  *Id*.  On

May 1, 1998, Mr. Heslin finalized and filed the application.  A634 A758, ¶ 11.

Mr. Heslin's work in connection with the preparation and filing of the patent

application was consistent with his usual practice for all clients and matters.  A634

A758, ¶ 12.  Between the initial draft application in late January, and the filing on May 1, the number of claims increased from 19 to 26, and eight drawings were added.  A758, ¶¶ 12-13.  In his deposition, Mr. Heslin noted "on several or more occasions [he and Dr. Nezhat] would discuss in great detail what the claims meant and what they may cover, and that he was very - - he wanted to be very precise in that."  A1549:8-11.  Mr. Heslin remembered that Dr. Nezhat "was very serious about his application.  And that's why I'm reasonably sure there were telephone conferences that I just didn't even bother recording, because at some point you can't keep charging for the same conversation."  A1549:22-1550:3.

Following prosecution of the application in the Patent and Trademark Office, the '384 patent was duly issued on February 29, 2000.  A117.

**Olympus's Reliance On JP '551.**

Olympus's petition for *inter partes* review relied on several prior art references.  One of these references was a Japanese patent application, Application Publication No. JP H10-33551 A ("JP '551"), which, except for the first page, was translated into English.  A221.  The non-translated first page contained bibliographic information, including the application's date of publication.  A221; A954.  None of the translated pages mentioned the publication date, so the information available to the Board did not include any evidence in English that would have provided a basis for determining that JP '551 is prior art.

Olympus alleged in its petition that JP '551 was published on February 2, 1998. A76. As explained below, Olympus now acknowledges that this is not the publication date of JP '551, and Olympus does not claim that it ever presented any evidence substantiating the publication date alleged in the petition.

Appended to the English translation of JP '551 was a translator's certification stating that "to the best of [the translator's] knowledge and belief the attached English translation is a true and correct translation by [the translator] of [JP '551] published on February 10, 1998." A295.

In its Patent Owner's Response, PST noted Olympus's failure to provide a fully translated copy of JP '551, as required under 37 C.F.R. § 42.63. In addition, PST noted that JP '551 failed to disclose perforations, as claimed in the '384 patent, to permit the release of steam during use. In conjunction with its reply brief, Olympus submitted a translated copy of the bibliographic page. A954. The partially translated copy presented with Olympus's petition was certified on November 12, 2013. A295. The reply translation, containing only the first page, was certified on October 16, 2014, long after the filing of the petition. A955.

## SUMMARY OF THE ARGUMENT

PST presented undisputed, strongly corroborated documentary and testimonial evidence that demonstrates both prior conception of the invention of the '384 patent and the continuous exercise of reasonable diligence toward

constructive reduction to practice during the critical period.  None of the facts

presented by PST are subject to material dispute.  Under the undisputed facts and

the settled law, PST established a date of invention preceding the publication of JP

'551, and JP '551 cannot provide a basis for a conclusion that the challenged

claims of the '384 patent are unpatentable.

Billing records from prosecuting attorney James Heslin's former law firm

establish without dispute that three drafts of the application that led to the '384

patent were prepared by Mr. Heslin and reviewed in depth by Dr. Nezhat during

the critical period of February 9, 1998 (the day before the publication date of JP

'551 eventually argued by Olympus) to May 1, 1998 (the date of constructive

reduction to practice through the filing of the application that resulted in the '384

patent).  It is undisputed that, during the critical period, Dr. Nezhat and Mr. Heslin

regularly spoke by telephone, met once in person, and revised the application to

include ten additional claims and eight additional drawings.  Mr. Heslin even

testified that Dr. Nezhat was the type of involved client who called so frequently

that Mr. Heslin did not find it appropriate to bill for each call.

Contrary to long and clearly settled law, the Board did not consider all of the

evidence in its assessment of whether PST proved the exercise of reasonable

diligence during the critical period.  Instead, the Board reviewed the activities of

Dr. Nezhat, and, after finding the evidence of his actions insufficient through the

application of an erroneous legal standard, announced that it was not going to consider the evidence of Mr. Heslin's activity. Thus, contrary to established Federal Circuit precedent, because some of the evidence was allegedly insufficient, the Board did not consider the balance of the evidence. The Board's remarkable failure to consider all of the evidence requires reversal of its determination that the challenged claims are unpatentable.

The Board similarly applied an erroneous legal standard by focusing on evidence of diligence during isolated intervals of time, rather than the entire critical period. This Court's precedent does not allow consideration of segments of the critical period, or impose a requirement that an applicant work on reduction to practice every day during the critical period or provide a daily accounting of his or her activities. A proper review of the evidence, taking account of the entire critical period, and not slanted by a focus on isolated dates on which no activity occurred, shows beyond any question that Dr. Nezhat and Mr. Heslin exercised diligence far beyond that required to satisfy the governing legal standard. Other than the arguments that led the Board away from the analysis required by the case law, Olympus provided no answer for the overwhelming evidence of diligence.

Additionally, the Board improperly considered a foreign prior art reference that was not presented in the manner required by 37 C.F.R. § 42.63(b). Olympus alleged in its petition for *inter partes review* that JP '551 was prior art that

rendered the '384 patent unpatentable. JP '551 is a Japanese language for which a complete translation was required, but Olympus did not submit one. Instead, Olympus submitted a partial translation of the reference that omitted the bibliographic information contained on the first page of the application. Problematically, this page contained the only reference to the publication date of JP '551. Rather than hold Olympus to the clear standard set forth by 37 C.F.R. § 42.63(b), the Board allowed the certificate of translation that was appended to the translation to serve as evidence sufficient to establish the priority date of the JP '551 reference. The Board's use of the of the translation certificate to serve as dispositive evidence of the JP '551 publication date was plainly erroneous because the form of the certification was inconsistent with the governing law and did not amount to an "affidavit" sufficient to establish by testimony the date of publication of JP '551. By overlooking Olympus's failure to comply with this unambiguous regulation, the Board disregarded its own regulation, and wrongly found sufficient evidence of the publication date of JP '551 when there was no sufficient evidence of record. Olympus's failure to present the translation of the bibliographic information of JP '551 was defective and should not have been considered by the Board.

Lastly, the Board's improper construction of the term "perforated," resulted in an erroneous finding that claims 11, 38, 41-44, 46, 47, and 49 are unpatentable.

Contrary to established Federal Circuit precedent, the Board imported the term

"passages" into its construction of the claim to "perforated." The term "passages"

is found nowhere in the claims, and appears only once in the specification. JP '551

discloses a "slit" in the clamping members of a forceps through which a knife

member may be inserted. The Board's finding that the "slit" disclosed by JP '551

anticipates the perforations claimed by the '384 patent rests on its erroneous

importation of "passages" into its construction of the term "perforations." Even

when applying the broadest reasonable construction standard, the Board must

follow general principles of claim construction. The Board's failure to do so is

clear error that requires reversal.

## ARGUMENT

## I.    STANDARD OF REVIEW

The Court reviews the Board's legal conclusions on priority, conception, and

reduction to practice without deference. *Brown v. Barbacid*, 276 F.3d 1327, 1332

(Fed. Cir. 2002) (citing *Hybritech Inc. v. Monoclonal Antibodies, Inc.,* 802 F.2d

1367, 1376 (Fed.Cir.1986)). The Court reviews the Board determinations as to

diligence for support by substantial evidence in the record. *In re Steed*, 802 F.3d

1311, 1317 (Fed. Cir. 2015). The Board's factual findings are reviewed for

substantial evidence. *Id.* (citing *Dickinson v. Zurko*, 527 U.S. 150 (1999); *In re

Gartside*, 203 F.3d 1305, 1315 (Fed.Cir.2000)). The Board's interpretation of PTO

regulations is entitled to substantial deference, unless the interpretation is "plainly

erroneous or inconsistent with the regulation." *In re Garner*, 508 F.3d 1376, 1378

(Fed. Cir. 2007).  Actions of the Board that are "arbitrary, capricious, an abuse of

discretion, unsupported by substantial evidence, or otherwise not in accordance

with law" will be set aside.  *In re Sullivan*, 362 F.3d 1324, 1326 (Fed. Cir. 2004); 5

U.S.C. § 706(2)(A).  "Claim construction is a question of law, which this court

reviews without deference." *Arlington Indus., Inc. v. Bridgeport Fittings, Inc.*, 632

F.3d 1246, 1252-53 (Fed. Cir. 2011) (citing *Cybor Corp. v. FAS Techs., Inc.*, 138

F.3d 1448, 1456 (Fed.Cir.1998) (en banc).

## II.    DR. NEZHAT CONCEIVED THE '384 INVENTION BEFORE THE PUBLICATION OF JP '551 AND HE AND MR. HESLIN WERE REASONABLY DILIGENT IN REDUCING THE INVENTION TO PRACTICE DURING THE CRITICAL PERIOD.

Under pre-AIA 35 U.S.C. § 102(a), a person shall be entitled to a patent

unless "the invention was known or used by others in this country, or patented or

described in a printed publication in this or a foreign country, before the invention

thereof by the applicant for a patent."  The application that resulted in the '384

patent was filed on May 1, 1998.  A634; A117.  In its petition for *inter partes*

review, Olympus attempted to prove that the '384 invention was unpatentable

because an unexamined Japanese patent application, JP '551, anticipated and made

obvious the claims of the '384 patent.  After alleging in its petition that JP '551

was published on February 2, 1998, Olympus eventually argued that it was

published on February 10, 1998, and thus was "described in a printed publication

in . . . a foreign country" before the '384 patent's May 1, 1998, filing date.

Pre-AIA 35 U.S.C. § 102(g) allows patent owners to establish an earlier

date, and thereby antedate prior references, by showing an earlier conception

followed by reasonable diligence in reducing the invention to practice. *See Singh*

*v. Brake*, 317 F.3d 1334, 1340 (Fed. Cir. 2003). "[T]he person 'who first

conceives, and, in a mental sense, first invents ... may date his patentable invention

back to the time of its conception, if he connects the conception with its reduction

to practice by reasonable diligence on his part, so that they are substantially one

continuous act.'" *Mahurkar v. C.R. Bard, Inc.*, 79 F.3d 1572, 1577 (Fed. Cir.

1996) (quoting *Price v. Symsek*, 988 F.2d 1187, 1190 (Fed.Cir.1993)).

To antedate the JP '551 reference, PST had the burden of proving that Dr.

Nezhat conceived the '384 invention prior to the date on which JP '551 was

published, and that Dr. Nezhat exercised reasonable diligence in reducing the '384

invention to practice "from a date just prior to the other party's conception to . . .

[the date of] reduction to practice [by the party first to conceive]." *Monsanto Co.*

*v. Mycogen Plant Sci., Inc.*, 261 F.3d 1356, 1369 (Fed. Cir. 2001) (quoting

*Mahurkar,* 79 F.3d at 1577).

The invention of the '384 patent was constructively reduced to practice

through the filing of the application that resulted in the issuance of the '384 patent

on May 1, 1998.  Thus, to antedate JP '551, PST had to prove that Dr. Nezhat

conceived the '384 invention on or before February 9, 1998, and that he and Mr.

Heslin exhibited reasonable diligence toward the filing of the application between

February 9, 1998 and May 1, 1998.

### A.    Dr. Nezhat Conceived The Invention Of The '384 Patent Before February 10, 1998.

Conception is the formation of "a definite and permanent idea of the

complete and operative invention, as it is hereafter to be applied in practice."

*Burroughs Wellcome Co. v. Barr Labs, Inc.*, 40 F.3d 1223, 1228 (Fed. Cir. 1994).

"An idea is sufficiently definite for conception 'when the inventor has a specific,

settled idea, a particular solution to the problem at hand, not just a general goal or

research plan he hopes to pursue.'"  *Spansion, Inc. v. Int'l Trade Comm'n*, 629

F.3d 1331, 1356 (Fed. Cir. 2010) (quoting *Burroughs Wellcome*, 40 F.3d. at 1228).

With its patent owner response, PST submitted the declarations of Dr.

Nezhat, Mr. Heslin, Florence Leto, an employee of Mr. Heslin's former law firm,

whose declaration was intended solely offered to authenticate records, and Jee Y.

Shin, a venture capitalist who witnessed Dr. Nezhat's laboratory notebook.  This

testimonial evidence demonstrated conception of the claimed inventions in the

'384 patent no later than January 28, 1998, and before the alleged February 10,

1998 publication date of JP '551.  *See* A667-669,  ¶¶ 7-11; A756-757, ¶¶ 7-8.

Corroboration by independent evidence is required where a party seeks to show conception through the inventor's testimony. *See Round Rock Research, LLC*, 81 F. Supp. 3d at 348-49 (citing *In re Jolley*, 308 F.3d 1317, 1321 (Fed.Cir.2002). This Court applies a "rule of reason" analysis when assessing the sufficiency of corroboration of an inventor's testimony. *See Loral Fairchild Corp. v. Matsushita Elec.,* 266 F.3d 1358, 1363 (Fed. Cir. 2001); *Mahurkar,* 79 F.3d at 1577. "An evaluation of all pertinent evidence must be made so that a sound determination of the credibility of the inventor's story may be reached." *Round Rock Research, LLC*, 81 F. Supp. 3d at 348-49 (citing *Mahurkar,* 79 F.3d at 1577) (internal quotation marks omitted).

The billing records maintained by Mr. Heslin's former law firm establish that he finalized a draft of the '384 application on January 28, 1998, and faxed the draft to Dr. Nezhat on January 29, 1998. In addition, Dr. Nezhat's laboratory notebook shows that the ideas for the complete invention were definite before that date. A667-668; A553-565; A566-578. Excerpts from the initial draft of the application, and Dr. Nezhat's laboratory notebook, closely mirror claims 1, 4-6, 8-9, 11-12, 38, 41-44, 46-47, and 49 of the '384 patent. A669-686, ¶ 11.

The date of Dr. Nezhat's laboratory notebook is corroborated by the declaration of Jee Y. Shin. *See generally* A762-763, ¶¶ 1-7, A1793-1796. Ms. Shin testified to the existence of her signature on the pages of the notebook, placed

there on February 25, 1997, well before February 1998.  Moreover, Ms. Shin

testified that "[t]he words, drawings, images, and descriptions of the drawings

shown on [the notebook] were present on the pages" in February 1997.  A763;

A1794-1795.

    The record also includes Mr. Heslin's January 28, 1998 letter to Dr. Nezhat

that attached the initial draft of the patent application.  A579.  Mr. Heslin testified

that Exhibit 2004 is a true and correct copy of his correspondence to Dr. Nezhat.

A756-757, ¶ 7.  Moreover, the letter is signed by Mr. Heslin and dated January 28,

1998.  A579.  Mr. Heslin's testimony and the accompanying exhibits sufficiently

corroborate the date of conception.  Accordingly, the evidence establishes that by

at least February 9, 1998, the inventions were definite, permanent, and complete in

Dr. Nezhat's mind.

### B.    Dr. Nezhat And Mr. Heslin Continuously Exercised Reasonable Diligence From February 9, 1998 To May 1, 1998.

    The critical period in this case is modest, less than three months.  The

evidence shows without conflict that throughout this brief period, progress toward

filing a patent application was diligently pursued by Dr. Nezhat and his lawyer.

The only challenge Olympus could present was based on the mistaken idea that

PST was required to show activity on every day during the critical period, or its

close corollary, that a finding of diligence could be avoided by pointing only to the

dates on which no activity occurred, rather than by considering all of the evidence, as a whole.

There is no rule requiring a specific type of activity in determining whether the applicant was reasonably diligent in proceeding toward actual or constructive reduction to practice during the critical period. *Round Rock Research, LLC v. Sandisk Corp.*, 81 F. Supp. 3d 339, 349 (D. Del. 2015) (citing *Brown v. Barbacid,* 436 F.3d 1376, 1380 (Fed. Cir.2006)). It is also not necessary for a party alleging prior invention to prove that he or she dropped all other work and concentrated solely on the particular invention involved throughout the critical period. *Rines v. Morgan,* 45 C.C.P.A. 743, 250 F.2d 365, 369 (1957). The patent owner's burden on the reasonable diligence issue does not include a requirement to provide evidence of activity on every single day during the critical period if a satisfactory explanation is evidenced. *Round Rock*, 81 F. Supp. 3d at 349 (citing *Monsanto,* 261 F.3d at 1369).

An inventor's testimony concerning his or her diligence must be corroborated and the sufficiency of the corroboration is evaluated under the "rule of reason." *Brown*, 436 F.3d at 1380 (citing *Jolley,* 308 F.3d at 1328); *see also Price,* 988 F.2d at 1196. The Federal Circuit held in *Symsek,* that "all of the evidence put forth by [the movant], including any of his corroborated testimony,

must be considered as a whole, not individually, in determining whether [the movant]" proved conception and reduction to practice.  988 F.2d at 1196.

In its patent owner's response, PST presented a range of evidence that demonstrates that Dr. Nezhat and Mr. Heslin continuously exercised reasonable diligence during the critical period between February 9, 1998, and May 1, 1998. The Board did not make any findings adverse to the credibility of Dr. Nezhat, Mr. Heslin or any of the other witnesses.  Likewise, the Board did not make any findings rejecting the authenticity of any of the documentary evidence offered by PST.  When "all of the evidence" is "considered as a whole," PST's collection of undisputed testimony and documentary evidence overwhelmingly satisfies its evidentiary burden of proving reasonable diligence.

On January 29, Mr. Heslin sent a letter dated January 28, 1998 to Dr. Nezhat, along with the first draft of the application that eventually resulted in the issuance of the '384 patent.  A copy of the letter was presented to the Board, its creation is noted in Mr. Heslin's law firm billing records, and Dr. Nezhat and Mr. Heslin both testified about the letter in their respective declarations.  A579; A598, A600; A669; A756-757.

On March 2, 1998, Dr. Nezhat submitted comments on the initial draft of the application to Mr. Heslin.  A686-687, ¶ 14; A757-758, ¶ 10; A927.  On March 4, 1998, the law firm billing records, authenticated by Mr. Heslin's and Ms. Leto's

declaration testimony, show Mr. Heslin reviewed Dr. Nezhat's comments and drafted questions for further clarification. A927; A757-758, ¶ 10. On March 12, 1998, Mr. Heslin faxed a letter containing these questions to Dr. Nezhat, which is included in the record and confirmed by Mr. Heslin's declaration testimony. A927; A757-758, ¶10. Dr. Nezhat's declaration testimony also states he received these questions on or around March 12, 1998. A687, ¶15.

Mr. Heslin's deposition testimony establishes that in 1998, it was his usual practice to dictate the text of whatever he was drafting, and send what he dictated to his secretary or the firm's word processing department for transcription. A1528:13-20. It would not be unusual for multiple days, sometimes as many as eight, to pass before the word processing staff completed the transcription of a given document. A1528:1-12. This dynamic likely accounts for the gap in time between Mr. Heslin drafting questions on March 2 and faxing the questions to Dr. Nezhat on March 12.

Within days of sending Dr. Nezhat his questions, on March 16, 1998, Dr. Nezhat and his business partner Mr. Truckai met with Mr. Heslin. The meeting was recorded in Mr. Heslin's law firm's billing records, and categorized under the matter number associated with the '384 patent. A598, A604. Declaration testimony of Dr. Nezhat and Mr. Heslin confirms that they attended the meeting. A687, ¶ 15; A758, ¶ 11.

The law firm billing records, verified by Mr. Heslin's and Ms. Leto's declaration testimony, show that on April 7, 1998, Mr. Heslin reviewed and revised the application.  A598, A604; A758, ¶ 11.

On April 13, 1998, after the April 7 revisions had been transcribed, Mr. Heslin sent a letter to Dr. Nezhat that included a second draft of the patent application.  In the body of the letter, Mr. Heslin stated that he "tried to reflect" Dr. Nezhat's comments from "when we last met," which included illustrating and describing the benefits of "various alternative electrode embodiments."  Mr. Heslin also requested Dr. Nezhat's final comments regarding the draft "so that it can be finalized and filed in the near future."  A copy of this letter was presented to the Board, its creation is noted in Mr. Heslin's law firm billing records, and Dr. Nezhat and Mr. Heslin testified to the sending and receiving the letter in their respective declarations.  A607; A687, ¶ 16; A758, ¶ 11.

Within weeks, the final application was finalized and filed on May 1, 1998. A634; A117; A687, ¶ 16; A758, ¶11.

The undisputed evidence described above establishes that during the entire critical period, Dr. Nezhat and Mr. Heslin reasonably diligently pursued the constructive reduction to practice of Dr. Nezhat's invention.  Between February 9 and March 2, Dr. Nezhat completed a careful review of the application for what would become his first patent and sent his comments to Mr. Heslin.  Between

-24-

March 3 and March 4, Mr. Heslin reviewed these comments and dictated questions for Dr. Nezhat.  By March 12, Mr. Heslin's questions were transcribed and sent to Dr. Nezhat.  Between March 13 and March 16, Dr. Nezhat prepared answers to Mr. Heslin's questions and the two met in person to discuss the application on March 16.  Between March 17 and April 13, Mr. Heslin completed a second draft of the application and sent a copy to Dr. Nezhat.  Between April 14 and April 30, Dr. Nezhat provided final comments regarding the draft "so that it [could] be finalized and filed in the near future."  On May 1, Mr. Heslin filed the application.  When "all of the evidence" described above is "considered as a whole," Dr. Nezhat's and Mr. Heslin's reasonable diligence during the critical period cannot seriously be questioned.  *See Price,* 988 F.2d at1196.

As already noted, the Board made no findings suggesting that Dr. Nezhat and the other witnesses presented by PST were anything but truthful.  There were no findings that any of the documentary evidence presented by PST was not authentic, or was not prepared, sent, or received at or about the times reflected on the documents or in the testimony of PST's witnesses.  The Board's conclusion that PST failed to prove the exercise of reasonable diligence was based on the application of legal standards inconsistent with those clearly set forth in the familiar decisions of this Court, and a shocking disregard of all of the evidence of

Mr. Heslin's activities in pursuit of the filing of the application for what became the '384 patent.

## III.  THE BOARD'S FAILURE TO CONSIDER ALL OF THE EVIDENCE REQUIRES REVERSAL.

Despite the undisputed testimony and documentary evidence showing a continuous, diligent process directed to the constructive reduction to practice of the invention of the '384 patent, the Board concluded that PST did not provide evidence sufficient to demonstrate Dr. Nezhat's exercise of reasonable diligence during the critical period.  A22.  The Board's decision in this regard is the result of two critical misapplications of the settled Federal Circuit law regarding diligence, and a failure to appreciate a third central principle of the law.  First, the Board admittedly did not consider "all of the evidence" because it did not consider the evidence of Mr. Heslin's activities during the critical period.  Second, the Board did not consider "all the evidence . . . as a whole," and instead looked to isolated days and intervals of time independently from the other evidence.  By focusing on the dates on which Dr. Nezhat did not act, the Board imposed a standard inconsistent with the settled rule that a patent owner need not demonstrate activity on every day during the critical period to establish the inventor's diligence.

### A.     The Board Acknowledged That It Did Not Consider Evidence of Mr. Heslin's Activities During The Critical Period

The Board surprisingly did not consider all of the evidence offered by PST. The Board explicitly acknowledged it did not address the activities of Mr. Heslin, Dr. Nezhat's patent attorney, during the critical period.  The Board's failure to consider evidence that is critical to the assessment of whether Dr. Nezhat exercised diligence in the constructive reduction to practice of his invention requires that the Board's unpatentability finding be reversed.

Applying the erroneous standard discussed below, the Board concluded that Dr. Nezhat's activities, taken alone, did not demonstrate the exercise of reasonable diligence.  A22.  Despite the longstanding command that "all of the evidence" be considered, the Board announced that it would therefore not consider the evidence of Mr. Heslin's activities.  *Id.*  The Board's refusal to do so was inconsistent with the requirement that it consider "all of the evidence" and, in a case in which a constructive reduction of practice – the filing of a patent application – is in issue, the Board's failure to consider the efforts of the inventor's prosecuting attorney is inexplicable.

Contrary to the Board's startling statement that it was not required to consider the evidence of Mr. Heslin's activities because Dr. Nezhat's activities were supposedly not sufficient, a patent owner may prove the exercise of reasonable diligence exclusively by the activities of the prosecuting attorney when

constructive reduction to practice is in issue. "A party may prove due diligence by showing his attorney's efforts to achieve a constructive reduction to practice." *In re Enhanced Sec. Research, LLC*, 739 F.3d 1347, 1358 (Fed. Cir. 2014) (citing *Bey v. Kollonitsch*, 806 F.2d 1024, 1027 (Fed. Cir. 1986)) ("Clearly, reasonable diligence can be shown if it is established that the attorney worked reasonably hard on the particular application in question during the continuous critical period.")

Throughout the critical period, Dr. Nezhat worked closely with Mr. Heslin to finalize the application. Evidence of Mr. Heslin's activity was particularly important, and worthy of consideration, because at various times during the critical period, diligence was unsurprisingly carried out primarily by Mr. Heslin, as he revised the application and prepared questions for Dr. Nezhat. Despite the obvious need for a prosecuting attorney or patent agent to execute many of the tasks essential to the filing of an application, and the extensive contributions shown without dispute to have been made by Mr. Heslin during the critical period, the Board did "not reach and, therefore, [did] not address whether Patent Owner provides sufficient evidence to demonstrate Mr. Heslin's continuous exercise of reasonable diligence for the entire critical period."[1] A22.

---

[1] The Board's identification of separate questions as to whether Dr. Nezhat and Mr. Heslin exercised reasonable diligence clearly demonstrates its failure to understand the requirements of the law. The question is whether PST proved that Dr. Nezhat, based on all of the activities of all who participated in the constructive reduction to practice of the invention, exercised reasonable diligence. There is no basis on

This mistaken application of an erroneous legal standard would require reversal under any circumstances, but the Board's error is of particular significance here.  The entire critical period follows Dr. Nezhat's retention of Mr. Heslin to prepare a patent application.  By the beginning of the critical period, Mr. Heslin had already prepared the initial draft of the patent application.  Ignoring the activities of Mr. Heslin at this time is an especially critical mistake because much of what would take place would center on him, and all of the diligence directed to the filing of the application would involve either Mr. Heslin's individual activities or his interaction with his client, Dr. Nezhat.  Mr. Heslin's activities are unquestionably a substantial part of the overall evidence of diligence, and the Board's failure to consider them was prejudicial in the extreme.  *See In re Enhanced Sec. Research, LLC*, 739 F.3d at 1358.

Moreover, the failure to consider Mr. Heslin's conduct caused the Board to penalize Dr. Nezhat for purported inactivity during a nearly four week period of the critical period, even though the evidence clearly established that the only relevant conduct during that period was that of Mr. Heslin, not Dr. Nezhat.  Specifically, the Board found that "[a]fter the March 16, 1998, conference, and until receiving a second draft of the patent application on April 13,

which the activities of Dr. Nezhat's lawyer can be treated as if they are not a part of Dr. Nezhat's exercise of diligence, and no justification for the Board's failure to consider evidence of Mr. Heslin's activities because it considered Dr. Nezhat's activities insufficient.

1998, Dr. Nezhat does not identify any specific activities undertaken or the dates of those activities, in furtherance of the filing of the patent application." A21. But this sub-period, between Mr. Heslin's meeting with Dr. Nezhat and the date Mr. Heslin sent Dr. Nezhat the next draft of the patent application, involved Mr. Heslin making revisions and changes to the draft application. The undisputed evidence clearly bears this out. Mr. Heslin received Dr. Nezhat's comments on the initial draft of the patent application on or around March 2, 1998. Mr. Heslin spent at least part of March 3 reviewing Dr. Nezhat's comments. Mr. Heslin's time records confirm that he prepared a letter to Dr. Nezhat. The letter was sent to Dr. Nezhat on March 12. Within days, Mr. Heslin and Dr. Nezhat met at Mr. Heslin's office to discuss the application. It stands to reason that their meeting including a discussion of at least the issues outlined in the letter of March 12. Armed with information from their meeting, Mr. Heslin then spent the next few weeks preparing a further revision of the application, which his time records confirm included drafting the new application on April 7, and then transmitting the typewritten draft to Dr. Nezhat on April 13. This entire period involved Mr. Heslin's conduct, not Dr. Nezhat's. The Board's refusal to examine Mr. Heslin's activities, and its critique of Dr. Nezhat during this time, is improper. The Board had a duty to examine all of the evidence of diligence for the entire critical period,

including both that of Dr. Nezhat and Mr. Heslin.  The failure to evaluate all of the evidence is a mistake for which reversal is required.

A court or agency required to consider whether a patent owner has proved the exercise of reasonable diligence is required to consider "all of the evidence."  It makes no sense to say, as the Board did, that, because some of the evidence is insufficient, the rest of the evidence will not be considered.  The Board's failure to consider all of the evidence requires that its unpatentability finding be reversed.

### B. The Board Wrongly Focused On Isolated Intervals, Rather Than the Entire Critical Period.

This Court has recognized "there need not necessarily be evidence of activity on every single day if a satisfactory explanation is evidenced."  *Monsanto Co.*, 261 F.3d at 1369.  *See also K&K Jump Start/Chargers, Inc. v. Schumacher Elec. Corp.*, 52 F. App'x 135, 140 (Fed. Cir. 2002) ("[I]t is not necessary that every minute of every day during the critical period be accounted for and that the inventor and his attorney do not need to neglect all their other work to focus solely on the invention."); *Rines v. Morgan*, 250 F.2d 365, 369 (C.C.P.A. 1957) ("[I]t is not necessary that an inventor or his attorney should drop all other work and concentrate on the particular invention involved")).  The case law also requires that the evidence be viewed "as a whole," and not with an excessive focus on isolated events or periods of time.  *Symsek,* 988 F.2d at 1196.  Despite these settled principles, the approach the Board took was directed to periods of time during

which activity did not occur, and to disregard of the overall context demonstrating a steady, continuous process that resulted in the completion and filing of the application without the passage of a lengthy period of time.

The Board attempted to justify its approach by noting that "[e]ven a short period of unexplained inactivity may be sufficient to defeat a claim of diligence." A16.  As support, the Board cited the frequently misunderstood decision in *In re Mulder*, a case in which the patentee presented literally no evidence of diligence. 716 F.2d 1542, 1542-46 (Fed. Cir. 1983).[2]  *Mulder* is often cited to illustrate the "short period" point made by the Board because the critical period in that case was only two days.  What *Mulder* actually holds is that a patentee having the burden to prove diligence may not meet that burden when it does not present any evidence, no matter how short the critical period may be.  *Id*. at 1545.  *Mulder* offers nothing of significance in a case in which there is evidence of diligence.

In *Mulder*, the patentee offered no evidence at all, apparently believing that the critical period was so short that a finding that he failed to exercise diligence could not be made.  *Id*.  The patentee failed to recognize that he had the burden of proof, and that his burden could not be discharged without some evidence.  The Court explained that the patentee's evidentiary burden could not drop below "the

---

[2] The Board also cited *Morway v. Bondi*, 203 F.2d 742, 749 (C.C.P.A. 1953), and *Ireland v. Smith*, 97 F.2d 95, 99 (C.C.P.A. 1938), but neither case discusses the significance of a "short period of unexplained activity."

point of eliminating all proof of diligence, no matter how short the period to be covered." *Id. Mulder* says nothing that makes it plausible that a lack of diligence could be found if the patentee presented evidence of diligence and the critical period was two days, or that two days of "unexplained inactivity" in an overall context demonstrating the exercise of reasonable diligence would be meaningful, given "that it is not necessary that every minute of every day during the critical period be accounted for.*" K&K Jump Start/Chargers, Inc*., at 140 (Fed. Cir. 2002).

In any event, the evidence in this case does not involve "unexplained inactivity." It is undisputed that Dr. Nezhat and Mr. Heslin were working on the completion of the patent application and that their work was completed within a few weeks. Any points of "inactivity" are amply explained by the undisputed evidence of Dr. Nezhat's and Mr. Heslin's professional commitments, the time needed for study of the application, and the logistical circumstances associated with transcription and communication of the drafts of the application and written communications between client and lawyer.

Throughout its decision, the Board faults Dr. Nezhat for not remembering with enough specificity the daily events that occurred over fifteen years ago, imposing an unjustified memory test with no foundation in the case law. First, the Board stated that "Dr. Nezhat is unable to identify any single date on which he worked on preparing the application . . . [between January 28, 1998, and March 2,

1998]", and that "Dr. Nezhat provides no testimony regarding his actions . . . from February 10, 1998, until March 1, 1998." A20. The Board's mention of the period between January 28 and February 9 was improper. The critical period did not begin until February 9, "just preceding the effective date of the adverse reference, to the actual or constructive reduction to practice." *In re Steed*, 802 F.3d 1311, 1317 (Fed. Cir. 2015). It does not matter what Dr. Nezhat did or did not do before February 9, and the Board's reference to the longer period of the time creates a distraction from the matters at hand. In any event, what is the point of discussing the period preceding March 2 at all? The record shows without conflict that, during that time, Dr. Nezhat worked on the application in a serious manner.

Billing records maintained by Mr. Heslin's former firm establish that Mr. Heslin faxed a draft of the application to Dr. Nezhat on Thursday, January 29, 1998. A fax sent by Mr. Heslin to Dr. Nezhat on Wednesday, March 4, thanks Dr. Nezhat for his Monday, March 2 letter that provided feedback on the initial draft. While Dr. Nezhat is unable to remember on which "single date[s]" he worked on the draft, undisputed testimony from Mr. Heslin and Dr. Nezhat shows that during the critical time Dr. Nezhat communicated regularly with Mr. Heslin, A1259:24-A1260:4, and that Dr. Nezhat was a "careful and serious" client who took the time to study closely and understand the draft claims and provide meaningful and useful feedback. A1549:1-5; A758-759, ¶ 13. This testimony is corroborated by Dr.

Nezhat having provided comments on the initial draft, which prompted Mr. Heslin to send a series of follow up questions to Dr. Nezhat on March 4.  It cannot be denied that Dr. Nezhat carried out these activities between the Thursday in late January on which the draft was sent, and the Monday in early March when he sent his comments.  What is it about the fact that Dr. Nezhat does not remember the telephone calls and studies he carried out during this time on a specific day or days that renders his exercise of diligence unreasonable?  Why, given that Dr. Nezhat is a busy surgeon with an active practice who cared enough about his first patent application to make careful comments, is there cause for concern that he does not remember when he took the actions the record shows he unquestionably took?  And how, given that the law does not require that he work on the application every day, can he be faulted for his lack of an extraordinary memory about which specific days he did things no one denies he did?

The Board's focus on the limitations of Dr. Nezhat's memory and its failure to appreciate the entire evidentiary record is contrary to Federal Circuit precedent.  This Court explained in *Symsek,* that "all of the evidence put forth by [the movant], including any of his corroborated testimony, must be considered as a whole, not individually, in determining whether [the movant]" proved conception and reduction to practice.  988 F.2d at 1196.  "All of the evidence" of the process that occurred between February 9, 1998 and May 1, 1998, "considered as a whole"

establishes that Dr. Nezhat endeavored earnestly to review, understand, and improve the drafts of his first patent application, and that Mr. Heslin performed as a responsible prosecuting attorney.  The documentary evidence corroborates Dr. Nezhat and Mr. Heslin's testimony of a diligent and continuous process, and demonstrates that reasonable diligence was exercised.  Dr. Nezhat's inability to remember specific dates on which he performed his work on the application does not undermine his exercise of diligence under Federal Circuit precedent.

Next, the Board faults Dr. Nezhat because he is "able to identify only two dates on which he took specific actions . . . between March 2, 1998, and May 1, 1998."  So what?  In this passage, the Board accepts that Dr. Nezhat has identified "two dates on which he took specific actions" but, for reasons that are not explained, this is deemed an indication of insufficient diligence.  The two dates to which the Board refers are the dates of Dr. Nezhat's March 2 fax and his March 16 meeting with Mr. Heslin.  By focusing on individual dates, rather than the evidence as a whole, the Board omits consideration of the practical realities of how a patent application is developed.  Dr. Nezhat sent his comments regarding the first draft of the application on March 2, and on March 4 Mr. Heslin dictated follow-up questions.  The word processing department in Mr. Heslin's firm transcribed these questions into a letter that was sent to Dr. Nezhat on March 12.  The Board faults Dr. Nezhat because he "does not recall when or how he responded to those

questions" and that he "does not identify any specific activities undertaking or the dates of those activities . . .[between March 16, 1998, and April 13, 1998]," but it does not deny that he responded, or explain how or why the specifics of what he did within this modest range of days is consequential under this Court's settled precedent.

Dr. Nezhat's recollection of when or how he responded to questions is not critical. What matters is that the billing records establish beyond question that Mr. Heslin sent questions to Dr. Nezhat, the two met in-person shortly thereafter, and Mr. Heslin completed a second draft of the patent application in early April. This evidence, when viewed as a whole, supports a finding that Dr. Nezhat and Mr. Heslin exercised reasonable diligence in reducing the invention of the '384 patent to practice.

In *Monsanto*, the Court cited *Jones v. Evans*, 46 F.2d 197, 202 (C.C.P.A. 1931). In *Jones*, the Court of Customs and Patent Appeals explained that

> [I]n deciding this matter, some consideration must be had of the difficulties which ensue when a device of as delicate and intricate a character as this is being perfected . . . It would be a manifest perversion of justice to say that the original inventor of this system of control should lose the benefit of his invention by the mere fact that a possible interval from April 16th to early in July elapsed, in which it does not affirmatively appear that any steps were being taken toward the filing of a proper application for patent. It may be that the machinery which appellant had set in motion in the General Electric Company was moving slowly, but not to such an extent, in our opinion,

-37-

> that the appellant should be caused to lose the fruits of
> his invention thereby.

46 F.2d at 202. The record in this case establishes that between January 28, 1998, and May 1, 1998, an application for what would become the '384 patent was revised, amended, discussed, and finalized. Between February 9, 1998, and May 1, 1998, Dr. Nezhat reviewed and provided feedback regarding two drafts of the patent, and approved the final application. During that time, Dr. Nezhat and Mr. Heslin met in person, corresponded by faxes and letters, and spoke on the telephone more times than Mr. Heslin felt comfortable billing. The entire critical period, not the periods of inactivity, was the required point of focus.

### C. The Board Applied An Erroneous Standard To The Evidence Of Diligent Pursuit Of The Application.

In addition to failing to consider all of the evidence, the Board applied an improper legal standard to the evidence it considered. The Board found that Dr. Nezhat gave Mr. Heslin comments regarding the initial draft of the application, that Dr. Nezhat received follow up questions from Mr. Heslin, and that a conference between Dr. Nezhat and Mr. Heslin occurred on March 16, 1998. A20-21. The Board concluded, however, that the evidence was inadequate because PST provided no evidence regarding the "nature" of the interactions underlying this undisputed evidence. *See* A20 ("No evidence is presented as to the nature of those comments."); *see also* A21("[Dr. Nezhat does not recall when or how he

responded to those questions"); *Id.* ("No evidence is presented as to the nature of this conference."). This unrealistic assessment of the evidence is unjustified. Of course, there was evidence about the "nature" of the comments and the conference. The comments and the conference addressed the patent application that client and lawyer were seeking to complete in an accurate and complete manner. There is no case law supporting the idea that Dr. Nezhat was required to prove whether he corrected Mr. Heslin's spelling or his use of technical terminology, or asked him to modify a discussion of the prior art, or whether Dr. Nezhat or Mr. Heslin was the inspiration for the new claims and drawings, or anything else. As already noted, "[t]here is no rule requiring a specific kind of activity in determining whether the applicant was reasonably diligent in proceeding toward an actual or constructive reduction to practice." *Brown*, 436 F.3d at 1380. The "nature" of the admitted interactions between client and lawyer is relevant only insofar as it can be determined whether they involved the completion of the application. On this point, there is no dispute, and the Board committed legal error when it imposed on Dr. Nezhat a burden to specify the "nature" of interactions that undeniably involved the completion of the application. The Board's interest in the "nature" of these interactions was not grounded in the law.

The Board's failure to appreciate or acknowledge the "nature" of the interactions between Dr. Nezhat and Mr. Heslin is difficult to understand given the

documentary evidence that Olympus did not challenge and the Board did not question. Dr. Nezhat's comments followed his receipt of the first draft of the application. The comments prompted follow up questions from Mr. Heslin. Their correspondence culminated in a meeting between the two men. The Board does not dispute or question the credibility of the documents or testimony confirming that these events took place. Rather, the Board apparently takes issue with the absence of a detailed account regarding what was said during the meetings. Such an account is not warranted by the law, and not necessary for a reasonable evaluation of the evidence. "The basic inquiry is whether, on all of the evidence, there was reasonably continuing activity to reduce the invention to practice." *Brown*, 436 F.3d at 1380. On this, there can be no dispute. Each of the events in question consisted of an interaction between an inventor and a prosecuting attorney that indisputably moved the patent application closer to being filed. Each of these events demonstrates "reasonably continuing activity," regardless of its specific "nature." The Board did not find that the events did not occur, and the absence of specific details about their "nature," forgotten over time, does not diminish their evidentiary weight under the proper legal standard set forth in this Court's decisions.

**IV.  JP '551 SHOULD NOT HAVE BEEN CONSIDERED BY THE BOARD AND THERE WAS NO EVIDENCE TO ESTABLISH THE PRIORITY DATE OF JP '551.**

The Board improperly considered a foreign prior art reference that was not presented in the manner required by 37 C.F.R. § 42.63(b).  By overlooking Olympus's failure to comply with this unambiguous regulation, the Board disregarded its own regulation, and wrongly found sufficient evidence of the publication date of JP '551 when there was no sufficient evidence of record.

Olympus alleged in its petition for *inter partes* review that JP '551 was prior art that rendered the '384 patent unpatentable.  JP '551 is a Japanese language patent application for which a full translation was required.  37 C.F.R. § 42.63(b) provides "[w]hen a party relies on a document or is required to produce a document in a language other than English, a translation of the document into English and an affidavit attesting to the accuracy of the translation must be filed with the document."   Olympus did not submit a full English language translation of JP '551 with its petition for *inter partes* review.  *See* A221.  The first page of the application contained bibliographic information, including the application's publication date, but that particular page was not translated.  *See id*.; A954.  Nevertheless, the Board concluded that Olympus met its obligation under section 42.63(b) by filing the Japanese language copy of JP '551, a partial English translation of JP '551 that excluded the bibliographic information, and a certificate

attesting to the accuracy of the translation. A14.  None of that amounts to

compliance with the governing rules and, as a result, there was not sufficient

evidence on which the Board could base a finding that JP '551 was prior art to the

'384 patent.

The Board acknowledged that although the page containing the publication

date of JP '551 was not translated, the translator's certification states the

publication date.  A13-14.  The Board's reliance on the certification of the

translator, however, was improper.  To the extent the translator's certification

constitutes testimony regarding the publication date of JP '551, a purpose for

which the certification clearly was not offered, the testimony must have been

submitted in accordance with the governing rules.  It was not.

Under 37 C.F.R. 42.53(a), "[u]ncompelled direct testimony must be

submitted in the form of an affidavit."  Strict guidelines have been placed on

affidavits in proceedings before the Patent and Trademark Office.  28 U.S.C.

§1746 governs affidavits and provides:

> Wherever, under any law of the United States or under
> any rule, regulation, order, or requirement made pursuant
> to law, any matter is required or permitted to be
> supported , evidenced, established, or proved by the
> sworn declaration, verification, certificate, statement,
> oath, or affidavit, in writing of the person making the
> same (other than a deposition, or an oath of office, or an
> oath required to be taken before a specified officer other
> than a notary public), such matter may, with like force
> and effect, be supported, evidenced, established, or

proved by the unsworn declaration, certificate,
verification, or statement, in writing of such person
which is subscribed by him, as true under penalty of
perjury, and dated, in substantially the following form:

(1)    If executed without the United States: "I declare (or certify, verify, or
state) under penalty of perjury under the laws of the United States of
America that the foregoing is true and correct.  Executed on (date).
(Signature)".

*See also* 37 C.F.R. §1.68 ("Any document to be filed in the Patent and Trademark

Office and which is required by any law, rule, or other regulation to be under oath

may be subscribed to by a written declaration," provided "the declarant is on the

same document, warned that willful false statements and the like are punishable by

fine or imprisonment, or both (18 U.S.C. § 1001) and may jeopardize the validity

of the application or any patent issuing thereon.").

Here, the Japanese translator, who executed the certification in Tokyo,

Japan, states that he accurately translated the JP '551 reference, but does not state

so "under penalty of perjury under the laws of the United States of America."  The

translator also was not "warned" on the document that "willful false statements and

the like are punishable by fine or imprisonment, or both."  Accordingly, the

Board's reliance on a translation certificate to establish the publication date of JP

'551 was plainly erroneous because the form of the certification was inconsistent

with the governing law and did not amount to an "affidavit" sufficient to establish

by testimony the date of publication of JP '551.

The Board also found that the publication date is discernible from the Japanese language documents itself, when following the guidance set forth in Section 901.05(a) of the Manual of Patent Examining Procedure, which explains how to convert Japanese dates to Gregorian calendar dates.  A13.  But the rules governing IPR do not allow for the conversions described in the MPEP.  Rather, compliance with section 42.63(b) is mandatory.  Olympus was obligated to produce a full translation of JP '551 when it filed its petition.  Failure to comply with section 42.63(b) rendered JP '551 defective and incapable of demonstrating the date of publication.  *See Zhongshan Broad Ocean Motor Co., Ltd., Broad Ocean Motor LLC, & Broad Ocean Techs., LLC, Petitioners*, IPR2014-01121, 2015 WL 5452785, at *6 (Jan. 21, 2015).

In *Zhongshan*, the petitioner submitted a translated copy of a Japanese patent but did not include an affidavit attesting to the accuracy of the translation.  *Id*. at *4.  The Board explained that because the petitioner did not comply with section 42.63(b), the reference was defective and  incapable of rendering the challenged patent unpatentable.  *Id*. at *6.  ("Accordingly, we do not consider [the reference] and, as a result, deny the Petition with respect to the anticipation grounds based on [the reference].").  The petitioner in *Zhongshan*, like Olympus, A938, stated that it was unaware it had omitted the certification until it received the patent owner's response, and subsequently attempted to correct the mistake.  *Id*. at *5.  The Board

-44-

explained that the petitioner's correction was inadequate because the petitioner did not simply forget to attach the translator's certification, but "[r]ather, the mistake resulted from a failure to obtain the attesting affidavit at all--until attention later was drawn to the error by Patent Owner." *Id*. at *6. Olympus, just like the petitioner in *Zhongshan*, did not have a translated copy of the first page of JP '551 when it submitted its petition. The translation of JP '551 initially offered by Olympus was certified on November 12, 2013. A295. A belated translation of the bibliographic information, which the Board refused to consider as improper reply evidence, A13 n. 6, was certified nearly a year later, on October 16, 2014. A955. Like the failure to present the mandatory translation certification in *Shongshan*, the failure to present the translation of the bibliographic information of JP '551 here was defective and JP '551 should not have been considered by the Board.

The Board faults PST for not objecting to the incomplete translation of JP '551 when trial was instituted. A14. Instead, PST raised Olympus's failure to comply with section 42.63(b) in its patent owner's response. But, as PST explained during the hearing, "[PST has] no objection to the absence of the evidence . . . the obligation . . . on the Petitioner is to present sufficient evidence . . . to show a prima facie case in the Petition. And they failed. And an objection to evidence that does not satisfy their burden, . . . doesn't make a lot of sense." A1856:7-8, 13-19. Indeed, the failure to translate the bibliographic information of

JP '551 deprived the record of sufficient evidence to establish that JP '551

constitutes prior art to the '384 patent.  That failure alone is sufficient to reject the

grounds of unpatentability proposed by Olympus.  The evidence presented is

insufficient to prove anticipation or obviousness.  An evidentiary objection was not

required.  As a result, there was not sufficient evidence to find the '384 patent

unpatentable.

## V.    THE BOARD'S IMPROPER CONSTRUCTION OF THE TERM "PERFORATED" RESULTED IN AN INCORRECT FINDING OF UNPATENTABILITY.

Independent claim 38, and several dependent claims, of the '384 patent teach

"[a] bipolar surgical instrument comprising . . . a pair of opposed jaws . . . wherein

at least one of the jaws is perforated to permit the release of steam during use."

A146:36-45.  The Board construed several terms, but only its construction of the

term "perforated" was disputed by PST.  A9.  Based on its improper construction,

the Board incorrectly found that claims 11, 38, 41-44, 46, 47, and 49 of the '384

patent are unpatentable.

In *inter partes* review, claim terms in an unexpired patent are given their

broadest reasonable construction in light of the specification of the patent in which

they appear.  37 C.F.R. § 42.100(b).  The words of a claim are generally given

their ordinary meaning as understood by a person of ordinary skill in the art, except

when the patentee disavows the full scope of a claim term in the specification.  *See*

*Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012)

(citing *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed.Cir.2005) (en banc);

*Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1580 (Fed.Cir.1996)).

"Where the specification makes clear that the invention does not include a

particular feature, that feature is deemed to be outside the reach of the claims of the

patent, even though the language of the claims, read without reference to the

specification, might be considered broad enough to encompass the feature in

question." *Thorner* at 1366 (quoting *SciMed Life Sys., Inc. v. Advanced

Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1341 (Fed.Cir.2001)).

Claims 11, 25, 36, and 38 of the '384 patent include "at least one of the jaws

is perforated to permit the release of steam during use." See A145:65-67; A145:51-

52; A146:31-32; A146:44-45. The specification states that "[o]ptionally, either or

both of the jaws may be perforated or otherwise provided with passages in order to

permit the release of steam which is a byproduct of tissue heating." A143:25-27.

The statement in the specification that the "jaws may be perforated or

otherwise provided with passages" does not suggest that perforations are passages.

To the contrary, the language evidences an intentional choice by Dr. Nezhat to

distinguish "perforations" from "passages." Despite this, the Board interpreted

"perforated or otherwise provided with passages" to mean that "*passages* [are]

another form of *perforations*." A9 (emphasis in original).

This conclusion, and the Board's construction of the term "perforated," is the direct result of the improper importation of "passages" into the claims of the '384 patent. In *SuperGuide Corp. v. DirecTV Enterprises, Inc.*, 358 F.3d 870, 875 (Fed. Cir. 2004), the Court stated that "it is important not to import into a claim limitations that are not a part of the claim." 358 F.3d at 875 (citing *Electro Med. Sys. S.A. v. Cooper Life Sci., Inc.*, 34 F.3d 1048, 1054 (Fed.Cir.1994)). Here, the Board wrongly construed the term "perforated" to mean "at least one jaw has one or more perforations or passages formed there through, . . . ." A11.

The Board tried to bolster its construction by referencing non-technical dictionary definitions for "perforate," *see* A10 ("'[t]o pierce or puncture; particularly, to make a line or series of holes for such purposes as identification, decoration, or easy separation'"), and "perforation," *see id.* ("'[a]ny hole made by boring, punching, or piercing'"). But like the claims of the '384 patent, none of these definitions include the word "passage," and instead describe "holes" made by "piercing," "puncturing," "boring," or "punching." While the Board included a non-technical dictionary definition of "passage," *see* A11 ("'an opening or entrance into, through, or out of something'"), the Board ignored that that the patentee explicitly distinguished "perforations" from "passages" in the specification. *See Phillips*, 415 F.3d at 1316 (*en banc*) ("[O]ur cases recognize that the specification may reveal a special definition given to a claim term by the

patentee that differs from the meaning it would otherwise possess.  In such cases, the inventor's lexicography governs.").

The Board's construction is not even defensible under the broadest reasonable interpretation standard.  A8.  Even when applying the broadest reasonable interpretation, the Board may not construe claims "so broadly that its constructions are unreasonable under general claim construction principles." *Microsoft Corp. v. Proxyconn, Inc.*, 789 F.3d 1292, 1298 (Fed. Cir. 2015); *see also In re Skvorecz*, 580 F.3d 1262, 1267 (Fed. Cir. 2009) ("The protocol of giving claims their broadest reasonable interpretation . . . does not include giving claims a legally incorrect interpretation.").  The Board's disregard of Dr. Nezhat's intentional exclusion of term "passages" from the meaning of perforations, and its importation of "passages" from the specification into the claims, are clear errors of law.

Based on the improper construction of "perforated," the Board incorrectly found that claims 11, 38, 41-44, 46, 47, and 49 are unpatentable.  Decision at 31 ("In view of our construction of the limitation: 'wherein at least one of the jaws is perforated to permit the release of steam during use,' we are persuaded that slit 65 of JP '551 discloses the recited, *perforated* jaw of claims 11 and 38.").  JP '551 discloses a "slit" in the clamping members of the forceps through which a knife member maybe inserted.  The "slit," or "passage," in the view of the Board, is not

a perforation, which, as defined by the Board's dictionary, is a "hole made by boring, punching, or piercing."  A10.  As a result of the incorrect claim construction, the Board's finding that claims 11, 38, 41-44, 46, 47, and 49 are unpatentable must be reversed.

## VI.    CONCLUSION.

For the foregoing reasons, the Court should reverse the Board's final written decision finding that claims 1, 4-6, 8-9, 11-12, 38, 41-44, 46-47, and 49 of the '384 patent are unpatentable.

Respectfully submitted,

Date:  December 2, 2015

*/s/Daniel J. Weinberg*
Daniel J. Weinberg

## CERTIFICATE OF SERVICE

It is certified that copies of the foregoing has been served via electronic mail

transmission addressed to the persons at the address below:

Deborah E. Fishman
Katie J.L. Scott
KAYE SCHOLER LLP
deborah.fishman@kayescholer.com
katie.scott@kayescholer.com

Steven I. Weisburd
ARENT FOX LLP
steven.weisburd@arentfox.com

Date:  December 2, 2015                    */s/Daniel J. Weinberg*
                                          Daniel J. Weinberg

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(a)(7)(C), I certify that

the Appellant's Opening Brief is proportionally spaced, in a typeface of 14 points

or more and contains 11,836 words, exclusive of those materials not required to be

counted under Rule 32(a)(7)(B)(iii).

*/s/Daniel J. Weinberg*
Daniel J. Weinberg

**ADDENDUM**

Final Written Decision dated June 8, 2015

U.S. Patent 6,030,384

Trials@uspto.gov                                          Paper 56
Tel: 571-272-7822                              Entered:   June 8, 2015

UNITED STATES PATENT AND TRADEMARK OFFICE
————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD
————————

OLYMPUS AMERICA INC. and
OLYMPUS MEDICAL SYSTEMS CORPORATION,
Petitioner,

v.

PERFECT SURGICAL TECHNIQUES, INC.,
Patent Owner.

————————————

Case IPR2014-00233
Patent 6,030,384

————————————

Before FRANCISCO C. PRATS, BENJAMIN D. M. WOOD, and
JAMES B. ARPIN, *Administrative Patent Judges*.

ARPIN, *Administrative Patent Judge*.

FINAL WRITTEN DECISION
*35 U.S.C. § 318(a) and 37 C.F.R. § 42.73*

# I. INTRODUCTION

Olympus America Inc. and Olympus Medical Systems Corporation (collectively, "Petitioner") filed a corrected Petition requesting *inter partes* review of claims 1, 4–6, 8, 9, 11, 12, 38, 41–44, 46, 47, and 49 of Patent No. US 6,030,384 (Ex. 1011, "the '384 patent") pursuant to 35 U.S.C. §§ 311–319. Paper 7 ("Pet."), 3.  On June 16, 2014, we issued a Decision on Institution (Paper 16, "Dec. on Inst."), instituting *inter partes* review of claims 1, 4–6, 8, 9, 11, 12, 38, 41–44, 46, 47, and 49 of the '384 patent.  Dec. on Inst. 22.  Subsequent to institution, Patent Owner filed a Patent Owner Response (Paper 25, "PO Resp."), and Petitioner filed a Reply (Paper 35, "Pet. Reply") thereto.

The parties requested an oral hearing (Papers 40 and 42) and appeared before us on February 23, 2015.  The record includes a transcript of the hearing. Paper 55 ("Tr.").

We have jurisdiction under 35 U.S.C. § 6(c).  This Final Written Decision, issued pursuant to 35 U.S.C. § 318(a) and 37 C.F.R. § 42.73, addresses issues and evidence raised during the *inter partes* review.  For the reasons that follow, we determine that Petitioner has demonstrated by a preponderance of the evidence that claims 1, 4–6, 8, 9, 11, 12, 38, 41–44, 46, 47, and 49 of the '384 patent are unpatentable.

## A. The '384 Patent

The '384 patent proposes to solve problems (Ex. 1011, col. 1, ll. 11–67) relating to current flux around tissue treated by electrosurgery and tissue heating, in two ways (*see id.* at col. 2, ll. 11–61).  First, the '384 patent proposes to solve the problem of lateral current flux and heating by focusing the radio frequency

IPR2014-00233
Patent 6,030,384

energy through the lateral placement of oppositely-charged electrode members. *Id.*
at col. 2, ll. 11–27.  Annotated Figures 2A and 2B are reproduced below.[1]



Annotated Figures 2A and 2B depict alternative electrode configurations. *Id.* at
col. 3, ll. 53–54.  The lateral spacing of electrodes is depicted in these figures, in
which red and blue annotations represent opposite polarities, and is described in
detail in the Specification of the '384 patent. *Id.* at col. 4, ll. 29–52.

> The '384 patent discloses that:
>
> one jaw 200 may carry a first electrode member 202 which is laterally
> spaced-apart from a second electrode member 204, where the
> electrode members are connectable to opposite poles of a power
> supply.  An opposed jaw 206 may be free from electrodes of any sort.
> . . . When tissue is grabbed between the jaws 200 and 206, current
> flow will be generally limited to between the electrode members 202
> and 204.

*Id.* at col. 4, ll. 31–41.  This configuration having both electrodes on the same jaw
is depicted in annotated Figure 2A (above), and is illustrative of the configuration
recited in challenged claims 4 and 41 ("wherein electrode members are on the
same jaw").  *Id.* at col. 7, ll. 41–42; col. 10, ll. 11–12.  In contrast, Figure 2B is
described as "having a first electrode member 214 on a first jaw 216 and a second
electrode member 218 on a second jaw 220," such that the electrodes "will
generally limit current flow so that it does not extend significantly to tissue outside

---

[1] Petitioner provided these annotated figures.  Pet. 7.

3

IPR2014-00233
Patent 6,030,384

the lateral boundaries of the jaws 216 and 220." *Id.* at col. 4, ll. 44–50.  This configuration having electrodes on opposing jaws is illustrative of the configuration recited in challenged claims 5 and 42 ("wherein the first electrode member is on one jaw and the second electrode member is on the other jaw").  *Id.* at col. 7, ll. 43–45; col. 10, ll. 13–15.

In addition to laterally-spaced electrodes, the '384 patent discloses that "tissue penetrating elements" may be used to minimize the lateral current flow and, therefore, tissue heating outside of the jaws.  *Id.* at Abstract.  As the Specification of the '384 patent explains:

> In operation, tissue may be grasped between the jaws[,] so that the electrode members contact and/or the tissue penetrating elements enter into the tissue.  By energizing the electrode members at opposite polarities using a high frequency energy source, tissue between the jaws will be heated, coagulated, and/or necrosed, *while heating of tissue outside of the lines will be minimized*.

*Id.* (emphasis added).  Annotated Figures 2C and 2D, depicting such "tissue penetrating elements," are reproduced below.[2]



FIG. 2C    FIG. 2D

Annotated Figures 2C and 2D depict the use of tissue penetrating elements on the laterally-spaced electrodes of Figures 2A and 2B (above).  *See id.* at col. 5, ll. 7–14; *see also id.* at claims 6, 43, 44 (reciting a plurality of tissue penetrating

---

[2] Petitioner provided these annotated figures.  Pet. 9.

IPR2014-00233
Patent 6,030,384

elements).  Figure 3A, depicting a perspective view of such laterally-spaced tissue penetrating elements, is reproduced below.



FIG. 3A

Figure 3A depicts two rows of penetrating elements 22 and 32 mounted upon electrode members 24 and 34, respectively.  Tissue penetrating elements 22 and 32 are arranged in two straight lines, which may be disposed on the same or opposing jaws and which are parallel to each other when the jaws are closed over tissue.  *See id.* at col. 5, l. 46–col. 6, l. 30; *see also id.* at claims 9, 47.

*B. Illustrative Claims*

Claims 1 and 38 are independent and are illustrative.  Challenged claims 4–6, 8, 9, 11, 12 depend from claim 1; and challenged claims 41–44, 46, 47, and 49 depend from claim 38.  Claims 1 and 38 are reproduced below with distinctive limitations emphasized:

> 1.  A bipolar surgical instrument comprising:
>
>     a shaft having a proximal end and a distal end;
>
>     a pair of opposed jaws at the distal end of the shaft;
>
>     a first electrode member on one of the jaws;
>
>     a second electrode member on one of the jaws, wherein the first and second electrode members are electrically isolated from each other; and

5

an actuating mechanism for moving the jaws between an opened and closed configuration,

wherein electrode members lie parallel to and laterally spaced-apart from each other when the jaws are closed,

*wherein at least one of the electrode members comprises a plurality of tissue penetrating elements which project toward the opposed jaw.*

38. A bipolar surgical instrument comprising:

a shaft having a proximal end and a distal end;

a pair of opposed jaws at the distal end of the shaft;

a first electrode member on one of the jaws;

a second electrode member on one of the jaws, wherein the first and second electrode members are electrically isolated from each other;

*wherein at least one of the jaws is perforated to permit the release of steam during use*; and

an actuating mechanism for moving the jaws between an opened and closed configuration, wherein electrode members lie parallel to and laterally spaced-apart from each other when the jaws are closed.

Ex. 1011, col. 7, ll. 20–34; col. 9, l. 36–col. 10, l. 4 (emphases added).

### C. References, Declarations, and Depositions

Petitioner and Patent Owner rely primarily upon the following references, declarations, and depositions:

| Exhibit No. | References, Declarations; and Depositions |
|---|---|
| 1013 | Application Publication No. JP H10-33551 A, with certified English translation ("JP'551") |

IPR2014-00233
Patent 6,030,384

| Exhibit No. | References, Declarations; and Depositions |
| --- | --- |
| 1014 | Patent No. FR 598,149, with certified English translation ("FR'149")[3] |
| 1018 | Declaration of Roger Odell |
| 1020 | Translation of Bibliographic Page of JP'551 (including Certification of Accuracy) |
| 2002 | Nezhat Laboratory Notebook Scanned (Partial) |
| 2003 | Nezhat Laboratory Notebook Photographs (Partial) |
| 2004 | Letter, dated January 28, 1998, from James M. Heslin, Esq., to Dr. Camran Nezhat |
| 2005 | Declaration of Florence Leto |
| 2006 | Letter, dated April 13, 1998, from James M. Heslin, Esq., to Dr. Camran Nezhat |
| 2007 | Facsimile Cover Sheet (with Transmission Confirmation), dated March 12, 1998, from James M. Heslin, Esq., to Dr. Camran Nezhat |
| 2008 | U.S. Patent Application No. 09/071,689 |
| 2010 | Declaration of Dr. Camran Nezhat |
| 2012 | Declaration of James M. Heslin, Esq. |
| 2013 | Declaration of Jee Y. Shin |
| 2014 | Declaration of Dr. Robert D. Tucker |
| 2016 | Nezhat Laboratory Notebook Scanned (Complete) |
| 2018 | Supplemental Declaration of Dr. Camran Nezhat |
| 2019 | Supplemental Declaration of Jee Y. Shin |
| 2020 | Letter (redacted), dated March 12, 1998, from James M. Heslin, Esq., to Dr. Camran Nezhat; and Facsimile Cover Sheet (with Transmission Confirmation), dated March 12, 1998, from James M. Heslin, Esq., to Dr. Camran Nezhat |

[3] Unless noted otherwise, citations to JP'551 and FR'149 are to the certified English translations of those references.

IPR2014-00233
Patent 6,030,384

| Exhibit No. | References, Declarations; and Depositions |
|---|---|
| 2022 | Deposition Transcript of Dr. Robert Tucker |
| 2023 | Deposition Transcript of Dr. Camran Nezhat |
| 2024 | Deposition Transcript of James M. Heslin, Esq. |
| 2025 | Deposition Transcript of Jee Y. Shin |

### D.    *Reviewed Grounds of Unpatentability*

We instituted *inter partes* review on the following grounds of unpatentability:

| Ground(s) | Reference(s) | Challenged Claims |
|---|---|---|
| § 102(a) and § 103(a) | JP'551 | 1, 4–6, 8, 9, 11, 12, 38, 41–44, 46, 47, and 49 |
| § 103(a) | JP'551 and FR'149 | 1, 4–6, 8, 9, 11, 12, 43, 44, 46, and 47 |

## II. ANALYSIS

### A. Claim Construction

In an *inter partes* review, claim terms in an unexpired patent are construed according to their broadest reasonable interpretation in light of the specification of the patent in which they appear. 37 C.F.R. § 42.100(b); *In re Cuozzo Speed Techs. LLC*, 778 F.3d 1271, 1281–82 (Fed. Cir. 2015) ("Congress implicitly adopted the broadest reasonable interpretation standard in enacting the AIA," and "the standard was properly adopted by PTO regulation."); Office Patent Trial Practice Guide, 77 Fed. Reg. 48,756, 48,766 (Aug. 14, 2012).[4] Only terms which are in controversy

---

[4] Patent Owner contends that the Board's adoption of the broadest reasonable interpretation standard exceeded its rulemaking authority. PO Resp. 35–37. In view of the Federal Circuit's decision in *Cuozzo*, we do not consider this

need to be construed, and then only to the extent necessary to resolve the controversy. *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc*., 200 F.3d 795, 803 (Fed. Cir. 1999).

Claim terms are given their ordinary and customary meaning, as would be understood by one of ordinary skill in the art in the context of the entire disclosure. *In re Translogic Tech., Inc.*, 504 F.3d 1249, 1257 (Fed. Cir. 2007). A patentee may act as his or her own lexicographer by providing a special definition for a claim term in the specification with "reasonable clarity, deliberateness, and precision." *In re Paulsen*, 30 F.3d 1475, 1480 (Fed. Cir. 1994). Generally, in the absence of such a special definition or other considerations, "limitations are not to be read into the claims from the specification." *In re Van Geuns*, 988 F.2d 1181, 1184 (Fed. Cir. 1993).

In the Decision on Institution, we provided constructions for various terms of the challenged claims. Dec. on Inst. 8–12. Petitioner indicates that it agrees with our previous claim constructions. Tr. 12:19–13:8. Patent Owner disagrees with our previous construction of the term "perforated." *Id.* at 45:24–46:19.

The Specification of the '384 patent describes that "either or both of the jaws may be *perforated or otherwise provided with passages* in order to permit the release of steam which is a byproduct of tissue heating." Ex. 1011, col. 3, ll. 25–27 (emphasis added). Such perforations or passages are not depicted in the figures of the '384 patent. Consequently, although claim 38 only recites that the jaws may be *perforated*, the Specification describes *passages* as another form of *perforations* and does not distinguish between these terms. Thus, we determined that "perforated" does not clearly exclude the formation of a "passage."

---

contention further in this Decision. 778 F.3d at 1281–82; *see* Pet. Reply 15.

IPR2014-00233
Patent 6,030,384

In the Decision on Institution, we construed the limitation "at least one of the jaws is perforated to permit the release of steam during use" as "at least one jaw has one or more perforations or passages formed therethrough, so that steam generated between that jaw and tissue is released through the one or more perforations or passages." Dec. on Inst. 10–12. We further noted that a relevant definition of "perforate" is "[t]o pierce or puncture; particularly, to make a line or series of holes for such purposes as identification, decoration, or easy separation"; and a relevant definition of "perforation" is "*[a]ny* hole made by boring, punching, or piercing." *Id.* at 11 (citing MCGRAW-HILL DICTIONARY OF SCIENTIFIC AND TECHNICAL TERMS, 1394 (4th ed. 1989) (emphasis added) (Ex. 3001)).

Contrary to Petitioner's suggestion, we remain unpersuaded that the phrase "to permit the release of steam during use" may be ignored in construing this limitation. Pet. 18. Even if the phrase "to permit the release of steam during use" describes a *function* of the perforations, *functional* language may not be ignored in construing the claims. *Id.* A patent applicant is free to recite features of an apparatus either structurally or functionally. *See In re Swinehart*, 439 F.2d 210, 212 (CCPA 1971). A relevant definition of "steam" is "[w]ater vapor or water in its gaseous state." MCGRAW-HILL DICTIONARY OF SCIENTIFIC AND TECHNICAL TERMS, 1817. Because claim 38 recites that "at least one of the jaws is perforated to permit the release of steam during use," we understand that claim 38 requires only a single perforation or passage formed through either jaw. Thus, the at least one perforation or passage must pass through the jaw, such that the steam may be *released* from the tissue between the jaws.

Patent Owner contends that the term "perforations" does not include "passages," and that we erred in construing a "perforated" jaw to include at least one jaw having "*one or more perforations or passages formed therethrough*." PO

IPR2014-00233
Patent 6,030,384

Resp. 19–20.  Although Patent Owner contends that the Specification distinguishes perforations from passages, Patent Owner does not suggest how each term is to be understood, such that a person of ordinary skill in the art would distinguish between them.  *Id.*; *see* Tr. 45:14–16 (perforations as "small holes").  A "passage" is "an opening or entrance into, through, or out of something."  RANDOM HOUSE WEBSTER'S COLLEGE DICTIONARY, 964 (Random House ed. 1999) (Ex. 3003).  Consequently, we conclude that Patent Owner does not explain adequately why a perforation excludes a passage.  Within the context of the Specification of the '384 patent and in view of ordinary and customary meanings of the relevant words, as evidenced by the cited definitions, we interpret a perforation formed through a jaw and a passage formed through a jaw as alternative expressions of the same concept.  Therefore, we maintain that this limitation is construed properly to mean "at least one jaw has one or more perforations or passages formed therethrough, so that steam generated between that jaw and tissue is released through the one or more perforations or passages."

Because the parties agree with our constructions for the remaining claim terms construed in the Decision on Institution, to the extent necessary, we adopt these constructions for the Final Written Decision.  Tr. 12:19–13:8; 45:24–46:8.  Because no other claim terms are in controversy, no other claim terms need to be construed.

## B. Grounds of Unpatentability

### 1.    Overview

We instituted *inter partes* review of claims 1, 4–6, 8, 9, 11, 12, 38, 41–44, 46, 47, and 49 of the '384 patent on Petitioner's asserted ground that these claims are anticipated by or rendered obvious over JP'551 and of claims 1, 4–6, 8, 9, 11, 12, 43, 44, 46, and 47 on Petitioner's asserted ground that these claims would have

IPR2014-00233
Patent 6,030,384

been obvious over JP'551 and FR'149.  Pet. 11, 22.  In the Patent Owner

Response, Patent Owner contends that (1) because Petitioner failed to provide a

complete translation of JP'551, Petitioner fails to demonstrate that JP'551 is prior

art to the '384 patent (PO Resp. 8–11); (2) because Dr. Nezhat conceived of the

invention recited in the challenged claims before the effective date of JP'551 and

because Dr. Nezhat and Mr. Heslin acted with reasonable diligence from before the

effective date of JP'551, i.e., February 10, 1998, until the date of constructive

reduction to practice, i.e., May 1, 1998, JP'551 is not prior art to the '384 patent

(*id*. at 11–17); (3) JP'551 does not disclose or teach each and every element of

challenged claims 1, 4–6, 8, 9, 11, 12, 38, 41–44, 46, 47, and 49 (*id.* at 18–22); and

(4) Petitioner fails to demonstrate that a person of ordinary skill in the art would

have reason to combine the teachings of JP'551 and FR'149 to achieve the

instruments recited in challenged claims 1, 4–6, 8, 9, 11, 12, 43, 44, 46, and 47 (*id.*

at 23–35).  On this record, we are persuaded that Petitioner has demonstrated by a

preponderance of the evidence that claims 1, 4–6, 8, 9, 11, 12, 38, 41–44, 46, 47,

and 49 are anticipated by or rendered obvious over JP'551 and that claims 1, 4–6,

8, 9, 11, 12, 43, 44, 46, and 47 are rendered obvious over JP'551 and FR'149.

  2.    *Translation of JP'551*

  Pursuant to 37 C.F.R. § 42.63(b), "[w]hen a party relies on a document or is

required to produce a document in a language other than English, a translation of

the document into English and an affidavit attesting to the accuracy of the

translation must be filed with the document."  In support of its challenges to the

claims of the '384 patent, Petitioner filed a Japanese language copy of JP'551; an

English language translation of JP'551, and a certification, signed by the translator,

IPR2014-00233
Patent 6,030,384

attesting to the accuracy of the English language translation of JP'551 and stating that JP'551 was "published on February 10, 1998."[5] Ex. 1013.

Nevertheless, Petitioner's English language translation of JP'551 did not include a translation of the bibliographic information contained on the first page of JP'551.[6] PO Resp. 9; Pet. Reply 2. Patent Owner contends that, because the translation relied upon by the Petitioner failed to include a translation of this single page, the translation is incomplete, and Petitioner may not rely on this translation in support of the grounds of unpatentability under review. PO Resp. 9; Tr. 42:9–19.

Despite Petitioner's omission of a translation of the page containing the bibliographic information of JP'551, neither party disputes that JP'551's publication date is February 10, 1998, as evidenced by the translator's certification and the face of the Japanese language copy of JP'551. Tr. 44:1–5; Pet. Reply 1–2 (citing Manual of Patent Examining Procedure § 901.05(a) (9th ed. Mar. 2014) (describing how to convert Japanese format publication date information to Gregorian calendar date information)). Patent Owner also does not dispute the completeness of the translation of the remainder of JP'551. Tr. 42:1–8. Further,

---

[5] The parties acknowledge that, due to a typographical error, Petitioner indicates in the Petition that JP'551 was published on February *2*, 1998, instead of February *10*, 1998. Pet. Reply 1; PO Resp. 9 n.1; Tr. 43:21–44:16.

[6] Although Petitioner attempted to correct this deficiency by filing a translation of this missing page as Exhibit 1020 to the Reply, this exhibit was not served or filed as supplemental evidence under 37 C.F.R.§ 42.64(c) or filed as supplemental information under 37 C.F.R. § 42.123 and is new evidence exceeding the scope of the Patent Owner Response. Therefore, we do not consider Exhibit 1020 in rendering this Decision. *See Vibrant Media Inc. v. General Electric Co.*, Case IPR2013-00170, slip op. at 31 (PTAB June 26, 2014) (Paper 56) ("Whether a reply contains arguments or evidence that are outside the scope of a proper reply under 37 C.F.R. § 42.23(b) is left to our determination.").

IPR2014-00233
Patent 6,030,384

Patent Owner acknowledges that it did not timely object to the completeness of the translation of JP'551, which was filed with the Petition. *Id.* at 13:16–18; 39:4–10; 40:19–23; *see* 37 C.F.R. § 42.64(b)(1) ("Any objection to evidence submitted during the preliminary proceeding *must be served* within ten days of the institution of the trial."; emphasis added). Therefore, because Petitioner filed a Japanese language copy of JP'551; an English language translation of JP'551; and a certification, signed by the translator, attesting to the accuracy of the English language translation of JP'551; we conclude that Petitioner satisfied the requirements of 37 C.F.R. § 42.63(b). Further, we conclude that Patent Owner waived any objection to the completeness of the translation due to its failure to raise such objection in a timely manner, in accordance with 37 C.F.R. § 42.64(b)(1). Therefore, for purposes of this Decision, we determine that JP'551 was published on February 10, 1998.

> 3.   *Antedating JP'551*

For the reasons set forth above, Petitioner has produced *prima facie* evidence to establish that JP'551 is prior art to the '384 patent. Patent Owner contends, however, that the instruments recited in the challenged claims were conceived prior to the publication date of JP'551—namely, February 10, 1998 (*see* Ex. 1013, Certification). PO Resp. 9 n.1; 11–12. Patent Owner further contends, and Petitioner does not contest, that the recited instruments were reduced to practice constructively on May 1, 1998, the filing date of the patent application that issued as the '384 patent. *Id.* at 12; *see* Pet. Reply 3. In addition, Patent Owner contends that Dr. Nezhat, the named inventor, and Mr. Heslin, Dr. Nezhat's patent attorney, continually exercised reasonable diligence from at least February 10,

1998,[7] through May 1, 1998 ("the critical period"). *See* PO Resp. 12, 15–17. As a consequence, Patent Owner contends that JP'551 does not qualify as prior art under 35 U.S.C. § 102(a). *Id.* at 11.

We begin our analysis with the principles of law that generally apply to antedating a reference, followed by a brief discussion of the parties' contentions regarding conception. We then turn to the parties' contentions regarding whether there is sufficient evidence on this record to conclude that Dr. Nezhat continually exercised reasonable diligence during the entire critical period.

> *a.    Principles of Law*

Petitioner bears the burden of persuasion that the challenged claims are unpatentable, which includes the burden of establishing that any reference upon which it relies constitutes prior art under 35 U.S.C. § 102. 35 U.S.C. § 316(e); *see Mahurkar v. C.R. Bard, Inc.*, 79 F.3d 1572, 1576 (Fed. Cir. 1996) (holding that the challenger "bore the burden of persuasion . . . on all issues relating to the status of [the asserted reference] as prior art"). However, because Petitioner offered into evidence JP'551, which was published before the '384 patent's filing date, Patent Owner bears a burden of producing evidence supporting a date of invention before JP'551's publication date. *Mahurkar*, 79 F.3d at 1576–77. An inventor may antedate a reference if the inventor was the first to conceive of a patentable invention, and then connects the conception of the invention with its constructive reduction to practice by reasonable diligence on the inventor's part, such that conception and diligence are substantially one continuous act. *Id.* at 1577.

---

[7] In view of Petitioner's erroneous reference to February 2, 1998, as JP'551's publication date (*see supra* 12 n.5), Patent Owner proposes to show conception prior to February 2, 1998, and reasonable diligence from February 1, 1998, until May 1, 1998. PO Resp. 12. We do not analyze Patent Owner's arguments based on Petitioner's admitted typographical error.

However, an inventor's testimony, standing alone, is insufficient to carry the inventor's burden of production with respect to conception and diligence, as some form of corroboration is required. *Id.*; *Price v. Symsek*, 988 F.2d 1187, 1194 (Fed. Cir. 1993). A rule of reason applies to determine whether the inventor's testimony has been corroborated. *Price*, 988 F.2d at 1194.

During the period in which reasonable diligence must be shown, there must be continuous exercise of reasonable diligence. *In re McIntosh*, 230 F.2d 615, 619 (CCPA 1956); *see also Burns v. Curtis*, 172 F.2d 588, 591 (CCPA 1949) (referring to "reasonably continuous activity"). The party alleging diligence must account for the entire critical period. *Griffith v. Kanamaru*, 816 F.2d 624, 626 (Fed. Cir. 1987); *Gould v. Schawlow*, 363 F.2d 908, 919 (CCPA 1966). Even a short period of unexplained inactivity may be sufficient to defeat a claim of diligence. *Morway v. Bondi*, 203 F.2d 742, 749 (CCPA 1953); *Ireland v. Smith*, 97 F.2d 95, 99–100 (CCPA 1938). In *In re Mulder*, 716 F.2d 1542, 1542–46 (Fed. Cir. 1983), for example, the Federal Circuit affirmed a determination of lack of reasonable diligence, where evidence of record demonstrating any diligence was absent for a two-day critical period.

A party alleging diligence also must provide corroboration with evidence that is specific both as to facts and dates. *Gould*, 363 F.2d at 920; *Kendall v. Searles*, 173 F.2d 986, 993 (CCPA 1949). The rule of reason does not dispense with the need for corroboration of diligence that is specific as to dates and facts. *Gould*, 363 F.2d at 920; *Kendall*, 173 F.2d at 993; *see also Coleman v. Dines*, 754 F.2d 353, 360 (Fed. Cir. 1985) ("The rule of reason . . . does not dispense with the requirement for some evidence of independent corroboration."). Consequently, in order to antedate JP'551, Patent Owner must show conception prior to the publication date of JP'551 and continuous and corroborated diligence from prior to

IPR2014-00233
Patent 6,030,384

JP'551's publication date, i.e., February 10, 1998, until the date of constructive reduction to practice of the '384 patent, i.e., May 1, 1998.

> ### b.    Conception

In the Patent Owner Response, Patent Owner contends that the Nezhat, Heslin, Leto, and Shin Declarations (*see supra* Section I.C.), as well as at least Dr. Nezhat's laboratory notebook (Ex. 2002, Ex. 2003, and Ex. 2016)[8] and the cover letter and draft patent application, mailed January 28, 1998 (Ex. 2004 and Ex. 2008), collectively, demonstrate that Dr. Nezhat conceived of the instruments recited in the challenged claims of the '384 patent before the publication date of JP'551, namely, at least by February 10, 1998.  PO Resp. 12–15.  Patent Owner further contends that these documents independently corroborate Dr. Nezhat's testimony in his declaration and deposition that he conceived of the instruments recited in the challenged claims of the '384 patent prior to at least February 10, 1998.  *Id.*

In the Reply, Petitioner argues that Patent Owner has not established that Dr. Nezhat conceived of the instruments recited in the challenged claims of the '384 patent before at least February 10, 1998, because Patent Owner does not demonstrate that the evidence relied upon shows conception of electrically isolated "electrode members" that are "laterally spaced-apart" on the jaws, as required by independent claims 1 and 38, prior to at least February 10, 1998.  Pet. Reply 9.

---

[8] Because the laboratory notebook includes contributions from other persons, Petitioner disputes whether the laboratory noted book properly can be referred to as Dr. Nezhat's laboratory notebook.  Tr. 21:16–25; 24:22–25:4.  Because we do not rely on the laboratory notebook in this Decision, we need not decide this issue and, for simplicity, we will refer to these exhibits as partial and complete reproductions of "Dr. Nezhat's laboratory notebook."

IPR2014-00233
Patent 6,030,384

Even if we were to agree with Patent Owner that there is sufficient evidence to show conception, and to corroborate Dr. Nezhat's testimony that he conceived of the instruments recited in the challenged claims of the '384 patent before at least February 10, 1998, as we discuss below, Patent Owner does not provide sufficient evidence to demonstrate (or corroborate Dr. Nezhat's testimony) that Dr. Nezhat continuously exercised reasonable diligence during the entire critical period. Consequently, we need not reach and, therefore, do not address conception further in this Decision.

### c. *Diligence*

To demonstrate diligence during the entire critical period, Patent Owner relies upon the declarations and depositions of the following individuals: (1) Dr. Nezhat (Ex. 2010 and Ex. 2023); (2) Mr. Heslin (Ex. 2012 and Ex. 2024), a former partner at Townsend, Townsend, and Crew, LLP ("Townsend"), who was hired by Dr. Nezhat to draft and file the patent application that issued as the '384 patent; and (3) Ms. Leto (Ex. 2005), a Financial Systems Manager at Kilpatrick Townsend & Stockton LLP ("Kilpatrick Townsend"), successor to Townsend, Townsend, and Crew, LLP.  PO Resp. 16–17.  Of particular significance to our evaluation of the alleged diligence is Dr. Nezhat's testimony regarding his actions in revising the draft patent application, prepared by Mr. Heslin, which ultimately issued as the '384 patent, and Mr. Heslin's testimony regarding his actions in the drafting and filing of that patent application, as well as the testimony of Ms. Leto, concerning the Townsend billings records retained by Kilpatrick Townsend.  *Id.*

In the Patent Owner Response, Patent Owner contends that this testimony is evidence that Dr. Nezhat worked diligently over the critical period to prepare the application for filing.  *Id.* at 16.  In the Reply, Petitioner argues that Patent Owner does not provide sufficient evidence to show the dates of Dr. Nezhat's activities in

18

preparing the application for filing or the dates and facts explaining any periods of inactivity during the critical period or to corroborate Dr. Nezhat's testimony that he was reasonably diligent during the entire critical period with respect to constructively reducing the claimed invention to practice.  Pet. Reply 4–5 (citing *Garmin Int'l, Inc. v. Cuozzo Speed Techs. LLC*, Case IPR2012-00001, slip op. at 25 (PTAB Nov. 13, 2013) (Paper 59), *aff'd*, *In re Cuozzo Speed Techs. LLC*, 778 F.3d 1271 (Fed. Cir. 2015)).

In our analysis below, we discuss how the evidence, taken as a whole, does not support Patent Owner's contention that there was a continuous exercise of reasonable diligence during the entire critical period.  In particular, we address how this evidence does not demonstrate that Dr. Nezhat was diligent with respect to constructive reduction to practice.

As we explained previously, the claimed invention was reduced to practice constructively on May 1, 1998, when the patent application that issued as the '384 patent was filed.  The publication date of JP'551 is February 10, 1998.  Ex. 1013, Certification.  To show diligence with respect to constructive reduction to practice during the entire critical period, Dr. Nezhat testified that, "[a]fter conception, I diligently worked in the United States toward reducing to practice the claimed inventions, as evidenced by the filing of [U.S. Patent] Application No. 09/071,689 on May 1, 1998."  Ex. 2010 ¶ 6.

According to his testimony, "Dr. Nezhat worked 80-hour weeks, during which he performed multiple surgeries a week, and sometimes in a given day, and taught medical students daily."  PO Resp. 16 (citing Ex. 1020 ¶ 12); Ex. 2023, 76:5–14.  With respect to the period from his receipt of the initial draft patent application sent by Mr. Heslin on January 28, 1998, and until the submission of his comments on that initial draft patent application on March 2, 1998, however,

IPR2014-00233
Patent 6,030,384

Dr. Nezhat is unable to identify any single date on which he worked on preparing the application for filing, or on which he was scheduled for a surgery or had another specific conflict that would have prevented him from working on preparing the application for filing. *See* Ex. 2023, 70:9–71.23; 74:19–75:25; 77:21–78:5. Dr. Nezhat testifies only that, "*[t]hough I do not recall all of my specific daily activities from 1998*, I diligently worked with Mr. Heslin between February 1, 1998 and May 1, 1998, within the reasonable limits of my busy medical practice and teaching schedule to finalize the patent application by May 1, 1998." Ex. 2010 ¶ 13 (emphasis added). Although Dr. Nezhat need not have worked exclusively during the critical period to reduce the invention constructively to practice, Dr. Nezhat must account for his actions during the entire critical period, so that we may access the reasonableness of any gaps in his activity and explanations for any such periods of inactivity. *See Rieser v. Williams*, 255 F.2d 419, 424 (CCPA 1958) (finding no showing of diligence where no activity was shown during the first thirteen days of the critical period). Here, Dr. Nezhat provides no testimony regarding his actions relating to the constructive reduction of the invention to practice during the first nineteen days of the critical period, i.e., from February 10, 1998, until March 1, 1998.

Based on his review of correspondence and billing statements received from Kilpatrick Townsend, Dr. Nezhat is able to identify only two dates on which he took specific actions with respect to the preparation of the patent application for filing between March 2, 1998, and May 1, 1998. *Id.* ¶¶ 14, 15. First, on March 2, 1998, Dr. Nezhat submitted comments, to Mr. Heslin, on the initial draft patent application which Mr. Heslin mailed to him on January 28, 1998 – over a month earlier. *Id.* ¶ 14. No evidence is presented as to the nature of those comments. *See* Ex. 2023, 29:20–30:6. Second, on March 16, 1998, Dr. Nezhat participated in a

20

IPR2014-00233
Patent 6,030,384

conference regarding the draft patent application with Mr. Heslin. Ex. 2010 ¶ 15. No evidence is presented as to the nature of this conference. *See* Ex. 2024, 21:1–17. Although Dr. Nezhat testifies that he received a series of questions from Mr. Heslin "on or around March 4 and 12, 1998," he does not recall when or how he responded to those questions. Ex. 2023, 83:23–85:2: *see* Ex. 2020, 1 (facsimile transmission from Mr. Heslin to Dr. Nezhat dated March 12, 1998, suggesting conference with Mr. Heslin, Dr. Nezhat, and Mr. Truckai). After the March 16, 1998, conference, and until receiving a second draft of the patent application on April 13, 1998, Dr. Nezhat does not identify any specific activities undertaken or the dates of those activities, in furtherance of the filing of the patent application. Ex. 2010 ¶ 16. Moreover, Dr. Nezhat does not identify when, or if, he reviewed the second draft of the patent application or whether and, if so, how he provided comments to Mr. Heslin prior to the filing of the application on May 1, 1998. Ex. 2023, 86:8–87:9.

The testimony offered by Dr. Nezhat, to the extent that it is corroborated by Mr. Heslin, concerning the preparation and review of the draft patent application is not sufficiently specific as to facts and dates for the entire critical period during which diligence is required. Ex. 2023, 87:25–88:19; *see Gould*, 363 F.2d at 920; *Kendall*, 173 F.2d at 993. Given the absence of specific details concerning the work that was done on the draft patent application, the testimony from Dr. Nezhat is insufficient to establish reasonable diligence with respect to constructive reduction to practice during this time period. *See In re Harry*, 333 F.2d 920, 923 (CCPA 1964) (holding that statements unsupported by evidence or a showing of facts essentially amount to mere pleadings).

Based on the record before us, the testimony from Dr. Nezhat and Mr. Heslin regarding constructive reduction to practice is not sufficiently specific as to

IPR2014-00233
Patent 6,030,384

facts and dates for at least the portions of the critical period between February 10, 1998, and March 1, 1998; March 12, 1998, and March 15, 1998; and April 13, 1998, and May 1, 1998, and, therefore, does not satisfy Patent Owner's burden of coming forward with evidence to establish that Dr. Nezhat was reasonably diligent during the entire critical period.  Because Patent Owner does not provide sufficient evidence to demonstrate Dr. Nezhat's continuous exercise of reasonable diligence for the entire critical period, we also need not reach and, therefore, do not address whether Patent Owner provides sufficient evidence to demonstrate Mr. Heslin's continuous exercise of reasonable diligence for the entire critical period.

    *4.*    *Anticipation by and/or Obviousness over JP'551*

    *a.*    *Overview*

Petitioner argues that JP'551 anticipates and/or renders obvious claims 1, 4–6, 8, 9, 11, 12, 38, 41–44, 46, 47, and 49 of the '384 patent.  "A claim is anticipated only if each and every element as set forth in the claim is found, either expressly or inherently described, in a single prior art reference."  *Verdegaal Bros., Inc. v. Union Oil Co. of Cal.*, 814 F.2d 628, 631 (Fed. Cir. 1987) (citation omitted). A patent claim is obvious under 35 U.S.C. § 103(a) if the differences between the claimed subject matter and the prior art are "such that the subject matter[,] as a whole[,] would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains."  *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007).  The question of obviousness is resolved on the basis of underlying factual determinations, including:  (1) the scope and content of the prior art; (2) any differences between the claimed subject matter and the prior art; (3) the level of skill in the art; and (4) objective evidence of

IPR2014-00233
Patent 6,030,384

nonobviousness, i.e., secondary considerations.[9] *Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966).

  b.  *Person of Ordinary Skill in the Art*

Neither Petitioner nor its declarant proposes a definition for a person of ordinary skill in the art. *See* Pet. Reply 15. Further, Petitioner argues that no express statement of or expert testimony regarding the level of ordinary skill is necessary unless the level of ordinary skill in the art is material to the determination of obviousness. *Id.* Nevertheless, Petitioner's declarant provides testimony as to what a person of ordinary skill would understand the terms of the challenged claims to mean. *See, e.g.*, Ex. 1018 ¶¶ 19, 44.

> Patent Owner contends that a person of ordinary skill in the art possesses:
>
> a Bachelor's Degree in either Physics, Electrical Engineering, or Mechanical Engineering and two to three years' experience working in the field of electrosurgery. A person of ordinary skill in the art would be familiar with electrode designs and heating biological tissue through the application of various forms of electromagnetic energy, including RF energy.

PO Resp. 33 (citing Ex. 2014 ¶¶ 14–17). For purposes of the Decision on Institution, we determined that the prior art adequately reflects a level of ordinary skill in the art. Dec. on Inst. 20 (citing *Litton Indust. Prods., Inc. v. Solid State Sys. Corp.*, 755 F.2d 158, 163–64 (Fed. Cir. 1985)). Petitioner's declarant meets or exceeds the qualifications set forth in Patent Owner's definition of a person of ordinary skill in the art. *See* Ex. 1018 ¶ 7; Ex. 2022, 42:18–24. Further, Mr. Odell, as a person of equal or greater skill in the art, may testify as to what a person of

---

[9] Patent Owner does not contend in the Patent Owner Response that secondary considerations are present, which would render the challenged claims patentable over JP'551, alone or in combination with FR'149.

ordinary skill in the art would know or understand. *See* Ex. 2022, 41:12–42:11.

Therefore, to the extent that it is necessary, for purposes of this Decision, we adopt

Patent Owner's definition of a person of ordinary skill in the art.

### c.  Claim 1

Petitioner argues that JP'551 anticipates claim 1 and claims 4–6, 8, 9, 11,

and 12 depending therefrom.  Annotated Figure 1 of JP'551 is reproduced below.[10]



Annotated Figure 1 of JP'551 depicts an actuating mechanism, such as trigger 35,

for moving the jaws between an opened and closed configuration.  Ex. 1013 ¶¶ 19–

20.  Referring to claim 1, JP'551 teaches a bipolar surgical instrument comprising

a shaft having a proximal end and a distal end and a pair of opposed jaws at the

distal end of the shaft.  *Id.* ¶ 9.  Figures 1–9(D) depict a first embodiment of the

bipolar forceps of JP'551.  *Id.* ¶ 45.

Annotated Figure 5B of JP'551 is reproduced below.[11]



Annotated Figure 5B of JP'551 depicts a first electrode member and a second

_____

[10] Petitioner provided this annotated figure.  Pet. 19.

[11] Petitioner provided this annotated figure.  Pet. 21.

electrode member on one of the jaws, wherein the first and second electrode members are disconnected electrically, i.e., isolated, from each other. *Id.* ¶ 12.

Figures 8C and 9A of JP'551 are reproduced below from left to right.



Referring to Figures 8C and 9A, electrode members 17a and 17b and 17c and 17d may be disposed on opposing jaws 14a and 14b, respectively. Further, as depicted in Figure 5B (above), each of first and second electrode members 17a and 17b extends in an axial direction, and the members lie parallel to and laterally spaced-apart from each other, when the jaws are closed.

With regard to its "seventh embodiment," JP'551 teaches a plurality of tissue penetrating elements as its electrodes, which are parallel and laterally spaced-apart. Pet. 21–23 (citing Ex. 1013 ¶¶ 71–73). Referring to Figures 19(A), 19(B), 20(A), and 20(B), this embodiment teaches changing the constitution of treatment portion 3 of bipolar forceps 1 to have a cutting function, similar to that of the second embodiment. *See* Ex. 1013 ¶ 71; Figs. 10–14(C). Specifically, in the seventh embodiment, a plurality of substantially *serrated* projecting portions $17a_3$, $17b_3$, $17c_3$, $17d_3$ are formed on outer end portions (i.e., the portions contacting the living tissue H) of electrodes 17a, 17b, 17c, 17d of respective clamping members 14a, 14b of the second embodiment. *Id.* ¶ 71.

IPR2014-00233
Patent 6,030,384

Figures 20(A) and (B) are reproduced below.



In Figures 20(A) and 20(B), serrated portions $17a_3$, $17b_3$, $17c_3$, $17d_3$ "bite into" the tissue to improve coagulation of tissue H.  Ex. 1013 ¶ 73.  Thus, Petitioner argues that JP'551 also teaches that "at least one of the electrode members comprises a plurality of tissue penetrating elements which project toward the opposed jaw." Pet. 21.

Petitioner refers to the first, second, and seventh embodiments of JP'551 in support of this ground for unpatentability of claim 1.  Pet. 21–22.  Nevertheless, JP'551 states that

> Fig. 19(A), Fig. 19(B) and Fig. 20(A), Fig. 20(B) show the seventh embodiment of the present invention.  *This embodiment is characterized by changing the constitution of the treatment portion 3 of the bipolar forceps 1 having a cutting function of the second embodiment* (see Fig. 10 to Fig.14(C))

Ex. 1013 ¶ 71 (emphasis added).  Moreover, referring to Figure 20(B), the combination of the elements of the *second* embodiment (e.g., passage 65) and the *seventh* embodiment (e.g., serrated projecting portions 17 $a_3$, $17b_3$, $17c_3$, and $17d_3$) is depicted.  Further, this combination is described as changing the constitution of forceps 1 of the *first* embodiment.  *Id.*  Therefore, the seventh embodiment incorporates the structural characteristics of both the first and second

26

embodiments, and Petitioner bases its anticipation ground on, essentially, a single embodiment.

Patent Owner contends that JP'551 does not disclose the tissue penetrating elements recited in claim 1 of the '384 patent. PO Resp. 20. In particular, Patent Owner contends that JP'551's clamping members do not "damage" the living tissue. *Id.* (citing Ex. 1013 ¶ 78).[12] Thus, Patent Owner contends that a person of ordinary skill in the art would not understand the clamping members of JP'551 to disclose or suggest the "tissue penetrating elements" recited in claim 1 of the '384 patent. *Id.* (citing Ex. 2014 ¶ 22). As noted above, however, Petitioner relies upon JP'551's *seventh* embodiment of invention to disclose the "tissue penetrating elements" recited in claim 1 of the '384 patent. Pet. 21–23 (citing Ex. 1013 ¶¶ 71–73). JP'551's prohibitions regarding tissue damage relate to the *eighth* embodiment of the invention. Pet. Reply 12.

Unlike the seventh embodiment which is intended for use with thick tissue, the eighth embodiment is intended for use with thin tissue. *Id.*; *compare* Ex. 1013 ¶ 73 ("[T]he treatment portion unit 6 can also sufficiently coagulate the living tissue H *having a large thickness*."; emphasis added), *with* Ex. 1013 ¶ 77 ("[W]hen *a particularly thin living tissue H is clamped* between the respective clamping members 14a, 14b, only the projecting portions $17a_3$, $17b_3$, $17c_3$, $17d_3$ of the respective electrodes 17a, 17b, 17c, 17d are brought into contact with the living tissue H and hence, there is no possibility that the living tissue H is damaged."; emphasis added). Therefore, we are persuaded that, despite JP'551's teaching that the clamping members of the eighth embodiment would not damage *thin* tissue H,

---

[12] In the Patent Owner Response, Patent Owner incorrectly cites to expunged Exhibit 1003, instead of Exhibit 1013. We have attempted to correct these citations.

IPR2014-00233
Patent 6,030,384

JP'551 discloses that the clamping members of the seventh embodiment are different from those of the eighth embodiment and may penetrate *thick* tissue H. Pet. Reply 12; *see* Ex. 1013 ¶ 73 ("[T]he projecting portions $17a_3$, $17b_3$, $17c_3$, $17d_3$ of the respective electrodes 17a, 17b, 17c, 17d *bite into* the living tissue H . . ."; emphasis added). The challenged claims of the '384 patent do not recite a tissue thickness. *See* Ex. 1011, col. 7, ll. 20–34; col. 9, l. 36–col. 10, l. 4.

For the reasons set forth above, we are persuaded that Petitioner demonstrates by a preponderance of the evidence that claim 1 is anticipated by JP'551. Pet. 21–23. Further, a disclosure that anticipates under 35 U.S.C. § 102 also may render the claim unpatentable under 35 U.S.C. § 103, because anticipation is the epitome of obviousness. *See In re McDaniel*, 293 F.3d 1379, 1385 (Fed. Cir. 2002) ("It is well settled that 'anticipation is the epitome of obviousness.'") (quoting *Connell v. Sears, Roebuck & Co.*, 722 F.2d 1542, 1548 (Fed. Cir. 1983)). Consequently, we also are persuaded that Petitioner demonstrates by a preponderance of the evidence that claim 1 would have been rendered obvious over JP'551. Pet. 28.

> d.     *Claims 11 and 38*

Claim 38 includes substantially the same limitations as claim 1, except that claim 38 recites that "at least one of the jaws is perforated to permit the release of steam during use," and does not recite that "at least one of the electrode members comprises a plurality of tissue penetrating elements which project toward the opposed jaw," as recited in claim 1. *Id.* at 23. Claim 11 depends directly from independent claim 1 and also recites the perforated-jaw limitation. Ex. 1011, col. 7, ll. 65–67. Petitioner argues that the foregoing discussion of claim 1 demonstrates that JP'551 discloses all of the shared elements of claims 1 and 38. *Id.*

IPR2014-00233
Patent 6,030,384

Annotated Figures 14(A) and 19(B) of JP'551 are reproduced below.[13]



Annotated Figures 14(A) and 19(B) of JP'551 depict passage 65 in the axial direction of jaw 14a through which knife member 63 passes. Ex. 1013 ¶ 47. Petitioner argues that passage 65 "would serve the purpose of permitting the release of steam." *See* Pet. 24 (citing Ex. 1018 ¶ 48). Moreover, as with Petitioner's arguments regarding claim 1, Petitioner's arguments regarding claim 38 are based on elements drawn from multiple embodiments, i.e., the first and second embodiment, of JP'551. Pet. 23-24; *see* Ex. 1013 ¶¶ 45–47. However, JP'551 specifically teaches that

> Fig. 10 to Fig. 14(C) show the second embodiment of the present invention. This embodiment is characterized by providing a bipolar forceps 1 having a cutting function where a means for cutting a living tissue H and a cutting means manipulation part *are added to* the bipolar forceps 1 of the first embodiment (see Fig. 1 to Fig. 9(D)).

Ex. 1013 ¶ 45 (emphasis added). Thus, as with claim 1, Petitioner's argument that JP'551 anticipates claim 38 is based on a single embodiment disclosed in JP'551. Pet. 24.

Patent Owner contends that "JP'551 does not teach a perforated jaw, nor does JP'551 make any mention of permitting the release of steam during use." PO Resp. 21. With regard to whether JP'551 discloses that slit 65 would permit the

---

[13] Petitioner provided these annotated figures. Pet. 24.

release of steam during use, referencing JP'551's Figure 17(C), Patent Owner
contends that at least some steam formed between the clamping members 14a and
14b does not reach slit 65 and is not released via slit 65. PO Resp. 21–22.

Figures 17(A)–(C) of JP'551 are reproduced below:



Figure 17(A) depicts a plan view of clamping member 14a including slit 65
bracketed by electrodes 17a and 18a and electrodes 17b and 18b. Ex. 1013 ¶ 67.
Figure 17(B) depicts clamping members 14a and 14b clamping tissue H and the
alignment of slits 65 and electrodes 17a–d and 18a–d across tissue H. *Id.* Figure
17(C) depicts cut portion $H_4$ made by knife member 63 in tissue H and the
coagulated portions $H_2$, $H_3$, $H_5$, and $H_6$ of tissue H. *Id.* In view of the depiction in
these figures, Patent Owner contends that steam formed (1) between coagulated
portions $H_2$ and $H_5$ of tissue H between electrodes 17a and 17c and electrodes 18a
and 18c, respectively, and (2) between coagulated portions $H_3$ and $H_6$ of tissue H
between electrodes 17b and 17d and electrodes 18b and 18d, respectively, would
not reach slit 65 for release. PO Resp. 22 (citing Ex. 2014 ¶ 23). Patent Owner,
however, does not contend that steam formed between coagulated portions $H_5$ and
$H_6$ of tissue H between electrodes 18a and 18c and electrodes 18b and 18d,
respectively, would not reach slit 65 for release. *See* Ex. 2014 ¶ 24; *cf.* Ex. 1013,

IPR2014-00233
Patent 6,030,384

Fig. 15(C) (depicting only $H_2$ and $H_3$ of tissue H formed by two pairs of electrodes 17a and 17c and 17b and 17d on either side of slit 65).

Nevertheless, the claim language only requires that "*at least one of the jaws is perforated to permit the release of steam during use.*" Ex. 1011, col. 7, ll. 65–67 (claim 11); col. 9, ll. 44–45 (claim 38) (emphasis added). Thus, the claim language is sufficiently broad such the steam produced on only one side of the clamped tissue is released during use. As Patent Owner's declarant, Dr. Tucker, acknowledged, JP'551's slit 65 would allow some steam formed between clamping members 14a and 14b to be released. Ex. 2022, 149:2–13; *see* Pet. Reply 13. Claims 11 and 38 do not require that *all* steam formed between the jaws is released, but only that "*steam*" is released through a perforation or perforations in the at least one jaw. Thus, we are persuaded that the release via slit 65 of any steam formed between clamping members 14a and 14b during use is sufficient to satisfy the recited claim limitation. Further, it is not necessary for the reference to mention this recited function expressly in order for us to conclude that the disclosed structure performs the function. *See* Ex. 1018 ¶ 42. In view of our construction of the limitation: "wherein at least one of the jaws is perforated to permit the release of steam during use," we are persuaded that slit 65 of JP'551 discloses the recited, *perforated* jaw of claims 11 and 38. *See also* Ex. 1018 ¶ 42 ("I believe it is appropriate to assume that any jaw with perforation would 'permit the release of steam during use' and that this phrase does not impart any further structural limitation.").

We are persuaded that Petitioner demonstrates by a preponderance of the evidence that claims 11 and 38 are anticipated by JP'551. Pet. 23–24. Further, as noted above, a disclosure that anticipates under 35 U.S.C. § 102 also may render the claim unpatentable under 35 U.S.C. § 103. *See McDaniel*, 293 F.3d at 1385.

IPR2014-00233
Patent 6,030,384

Consequently, we also are persuaded that Petitioner demonstrates by a
preponderance of the evidence that claims 11 and 38 would have been rendered
obvious over JP'551.  Pet. 28.

> e.    *Claims 4–6, 8, 9, 12, 41–44, 46, 47, and 49*

Petitioner argues that the limitations of each of the challenged, dependent
claims are disclosed by JP'551.  *Id.* at 28 (citing Ex. 1018 ¶¶ 45–50; Ex. 1018C).
Patent Owner does not argue specifically that any of the limitations of the
challenged, dependent claims are not disclosed or suggested by JP'551.  *See* PO
Resp. 19, 22, 37.  Having reviewed JP'551 alongside the challenged dependent
claims, we are persuaded that Petitioner demonstrates by a preponderance of the
evidence that claims 4–6, 8, 9, 12, 41–44, 46, 47, and 49 of the '384 patent are
anticipated by, or, in the alternative, rendered obvious over JP'551.  *See* Pet. 24–28
(discussion of dependent claims 4–6, 8, 9, 12, 41–44, 46, 47, and 49); *McDaniel*,
293 F.3d at 1385.

> 5.    *Obviousness over JP'551 and FR'149*

> a.    *Claim 1*

To the extent that JP'551 does not teach or suggest that "at least one of the
electrode members comprises a plurality of tissue penetrating elements which
project toward the opposed jaw," Petitioner argues that FR'149 teaches or suggests
this limitation and that a person of ordinary skill in the art would have had reason
to modify the teachings of JP'551 to include penetrating elements as taught by
FR'149.  Pet. 29–31.  Figure 1 of FR'149 is reproduced below:



Figure 1 depicts five tissue penetrating elements (unlabeled) on each electrode jaw that project toward the opposing jaw. *Id.* at 29. FR'149 explains that the "recommended device consists of giving both electrodes a form *such that they limit the action of the coagulation to as narrow a section as possible*." Ex. 1014, 1 (emphasis added). Further, FR'149 shows the effect of coagulation with a variety of bipolar electrodes in Figures 2–5, and describes how in "the case of two combs; the destruction is more limited." *Id.* Given the desirability of limiting destruction and narrowing the action of the coagulation, an objective shared by both FR'149 and JP'551, Petitioner argues that a person of ordinary skill in the art would have had reason to modify the teachings of JP'551. Pet. 30–31 (citing Ex. 1018 ¶ 53).

> b.    *Claims 4–6, 8, 9, 11, 12, 43, 44, 46, and 47*

Petitioner does not apply the combined teachings of JP'551 and FR'149 to independent claim 38, from which claims 43, 44, 46, and 47 depend; but, instead, relies upon the application of JP'551 alone to claim 38 in the asserted ground discussed above. Petitioner argues that FR'149 teaches the tissue-penetrating-element limitations of claims 1, 6, 8, 9, 43, 44, 46, and 47 (*see* Ex. 1014, 1) and that a person of ordinary skill in the art would have had reason to modify the teachings of JP'551 (*see* Ex. 1013 ¶ 27) to include the tissue penetrating elements taught by FR'149. Pet. 31–32 (citing Ex. 1018 ¶¶ 54, 55, 59).

Petitioner does not present arguments with respect to claims 4, 5, 11, and 12, based on the combined teachings of JP'551 and FR'149. Consequently, with respect to claims 4, 5, 11, and 12, Petitioner relies on JP'551 to teach the additional limitations of these dependent claims, but, for this proposed ground, relies on FP'149 to teach the tissue-penetrating element of claim 1, from which these claims depend.

IPR2014-00233
Patent 6,030,384

Patent Owner contends that a person of ordinary skill in the art would not have reason to combine the teachings of FR'149 with those of JP'551 because the combination would change the principle of operation of JP'551 (PO Resp. 23–26); because JP'551 and FR'149 target coagulation in areas different from that targeted by the bipolar surgical instrument of the '384 patent (*id.* at 26–27); and because a device combining the teachings of JP'551 and FR'149 would not function (*id.* at 27–30). We are not persuaded by these contentions.

With regard to Patent Owner's contention that a person of ordinary skill in the art would not have reason to combine the teachings of FR'149 with those of JP'551 because the combination would change the principle of operation of JP'551 (*id.* at 23–26), we note that this contention is based on the description of the eighth embodiment of JP'551 (*id.* at 24 (citing Ex. 1013 ¶ 78)[14]). In particular, FR'149 depicts tissue penetrating elements "in the shape of knives" or "in the form of combs with sharp teeth fitting into each other." *Id.* at 25 (citing Ex. 1014, 1).[15] Patent Owner contends that, because the eighth embodiment of JP'551 teaches that "[t]here is no possibility that the living tissue is damaged before coagulation" (*id.* at 24; Ex. 1013 ¶ 77)), a person of ordinary skill in the art would not combine the tissue penetrating elements of FR'149 with the bipolar forceps of the eighth embodiment of JP'551. PO Resp. 25–26. As discussed above, however, Petitioner relies on the combination of the teachings of the first, second, and seventh embodiments of JP'551, rather than those of the eighth embodiment of JP'551, with the teachings of FR'149 to achieve the device recited in the challenged claims. Pet. 21–22 (quoting Ex. 1013 ¶ 72); *see supra* Sec. II.B.c.3.

---

[14] *See supra* 27 n.12.

[15] Patent Owner incorrectly cites to expunged Exhibit 1004, instead of Exhibit 1014.

Patent Owner also contends that a person of ordinary skill in the art would
not have reason to combine the teachings of FR'149 with those of JP'551 to
achieve the devices recited in the challenged claims because JP'551 and FR'149
target coagulation in areas different from that targeted by the bipolar surgical
instrument of the '384 patent.  We note that this contention is based on Patent
Owner's assertion that Figure 8 of the '384 patent depicts coagulation of the *entire*
region R between the tissue penetrating elements 22.  PO Resp. 26–27 (citing Ex.
1001, col. 6, l. 62–col. 7, l. 13).  This, however, is only an embodiment of the
bipolar surgical instruments of the '384 patent, and, absent more, we do not read
limitations of this embodiment into the challenged claims.  *Van Geuns*, 988 F.2d at
1184.

JP'551 describes a device which causes coagulation between the clamping
members, but which achieves different depths and breadths of coagulation
depending upon specific treatment requirements.  *Id.* (citing Ex. 1013 ¶ 3).
Similarly, FR'149 describes that "[t]he recommended device consists of giving
both electrodes a form such that they limit the action of the coagulation to as
narrow a section as possible."  Ex. 1014, 1.  In particular, FR'149 describes that,
"[d]epending on the case, these electrodes will either be in the shape of knives,
*placed on either side of the area to be destroyed*, or preferably in the form of
combs with sharp teeth fitting into each other (fig. 1)."  *Id.* (emphasis added).
Thus, both devices teach limiting the extent of the coagulation generally to that
necessary for the given treatment.  While challenged claims 1 and 43, for example,
recite that "at least one of the electrode members comprises a plurality of tissue
penetrating elements which project toward the opposed jaw," the claims do not
recite where the coagulation occurs or to what extent.  Ex. 1011, col. 7, ll. 29–34
(claim 1); col. 10, ll. 17–20 (claim 43); *see also id.* at col. 10, ll. 21–23 (claim 44

35

recites a plurality of penetrating elements on both electrode members).
Consequently, we are persuaded that the combination of the teachings of JP'551
and FR'149 are sufficient to teach or suggest the recited limitations of claim 1, 6,
8, 9, 43, 44, 46, or 47.

Finally, Patent Owner contends that because of the age of FR'149 and the
differences in generator technology at the time of the filing of FR'149, i.e., May 8,
1925, "it would be impossible to determine how such a device would work with
modern solid state, microprocessor controlled generators," such as those utilized in
the devices described in JP'551. PO Resp. 28 (citing Ex. 2014 ¶¶ 33–34).
Consequently, Patent Owner contends that the results of the combination of the
teachings of JP'551 with those of FR'149 are not predictable. *Id.* at 29. Thus, if
the results of the combination are not predictable, a person or ordinary skill in the
art would not have reason to combine the teachings of FR'149 with those of
JP'551. *Id.* We are not persuaded that, for these reasons, the results of the
combination of the teachings of JP'551 and FR'149 are not predictable.

As Petitioner notes, both JP'551 and FR'149 "identify the objective of
coagulation within a defined region of tissue being treated." Pet. Reply 14. Here,
Petitioner relies on the FR'149 to teach tissue penetrating elements in view of the
serrated portions of seventh embodiment of the devices of JP'551. *Id.*
Specifically, Petitioner states that "FR'149 explains that the purpose of this
structure is that the 'recommended device consists of giving both electrodes a form
such that they limit the action of the coagulation to as narrow a section as
possible.'" Pet. 30 (citing Ex. 1014, 1). As noted above, the coagulated tissue may
be limited to the area between sharp knives or between interfitting teeth of combs.
Ex. 1014, 1. Limiting the area of coagulation is a goal shared by JP'551 and
FR'149. Ex. 1013 ¶¶ 3, 27, 33–43; Ex. 1014, 1; *see* Ex. 1018 ¶ 53 ("JP'551

36

IPR2014-00233
Patent 6,030,384

considers *the same problem* [as FR'149], namely, how to control the width and depth of coagulation."; emphasis added). Patent Owner's declarant acknowledged these shared goals. Ex. 2022, 189:23–190:4. Petitioner, however, does not rely on FR'149 to teach the use of generators in an electrosurgical device or to suggest that the devices of JP'551 and FR'149 could be combined physically. *Id.* Therefore, we are persuaded that Petitioner has shown sufficient reason to combine the teachings of JP'551 and FR'149 to achieve the recited instrument of the challenged claims. Pet. 28–32; *KSR*, 550 U.S. at 416 ("The Court recognized that when a patent claims a structure already known in the prior art that is altered by the mere substitution of one element for another known in the field, the combination must do more than yield a predictable result."; citations omitted).

For the reasons set forth above, we are persuaded that Petitioner demonstrates by a preponderance of the evidence that claims 1, 4–6, 8, 9, 11, 12, 43, 44, 46, and 47 would have been rendered obvious over JP '551 and FR'149.

## C. Motions to Exclude Evidence

Both Petitioner and Patent Owner filed Motions to Exclude Evidence. We address these motions sequentially.

### 1.    Petitioner's Motion to Exclude Evidence

Petitioner filed a Motion to Exclude Evidence (Paper 41 ("Pet. Mot.")). In particular, Petitioner moves to exclude Patent Owner's exhibits, as follows:

IPR2014-00233
Patent 6,030,384

| Patent Owner's Exhibits | Proposed Grounds for Exclusion |
|---|---|
| Exhibits 2002, 2003, and 2016 | FRE 106, 403, and 901 |
| Exhibits 2004, 2006, 2007, 2008, and 2020 | FRE 106, 403, 502, 802, 803, and 901 |

Patent Owner filed an Opposition to Petitioner's Motion to Exclude Evidence (Paper 47 ("PO Opp.")); and Petitioner filed a Reply to Patent Owner's Opposition to the Motion to Exclude Evidence (Paper 52 ("Pet. Reply to Opp.")).

> a.    *Exhibits 2002, 2003, and 2016*

Exhibits 2002 and 2003 are scans and photographs, respectively, of selected pages of Dr. Nezhat's laboratory notebook; Exhibit 2016 is a scan of all pages of Dr. Nezhat's laboratory notebook.  Patent Owner relies upon these exhibits to support its arguments that Dr. Nezhat conceived of the instruments recited in the challenged claims of the '384 patent prior to the publication date of JP'551.  PO Resp. 13; *see* Tr. 19:9–12.  Nevertheless, because Patent Owner does not provide sufficient evidence to demonstrate (or corroborate Dr. Nezhat's testimony) that Dr. Nezhat continuously exercised reasonable diligence during the entire critical period, we do not reach and do not address the date of conception in this Decision. *See supra* Section II.B.3.b.  Because we do not rely on Exhibit 2002, 2003, or 2016 in reaching the Decision here, with respect to these exhibits, we dismiss Petitioner's Motion to Exclude Evidence as moot.

> b.    *Exhibits 2004, 2006–2008, and 2020*

Exhibits 2004, 2006, and 2020 are copies of letters allegedly sent from Mr. Heslin to Dr. Nezhat.  Pet. Mot. 12.  Further, Exhibits 2004 and 2006 include copies of a draft patent application, allegedly prepared by Mr. Heslin and submitted to Dr. Nezhat, for his review.  *Id.*; PO Resp. 13–14, 17.  Exhibit 2007

38

IPR2014-00233
Patent 6,030,384

includes a facsimile cover sheet and a confirmation of receipt, dated March 12, 1998.  Pet. Mot. 12.  Exhibit 2008 allegedly is a copy of the application, as filed with the U.S. Patent and Trademark Office, that issued as the '384 patent.  *Id.*; *see* Ex. 2012 ¶ 11.  Petitioner objects to each of these exhibits as lacking authentication (FRE 901), as inadmissible hearsay (FRE 802 and 803), and as incomplete (FRE 106).  Pet. Mot. 12–15.

As an initial matter, we note that in order to file a motion to exclude evidence, the moving party must first demonstrate that it timely objected to the evidence that it seeks to exclude.  37 C.F.R. § 42.64(c).  Here Petitioner fails to identify where in the record it objected to the filing of Exhibit 2020.  Consequently, to the extent that there is no evidence of an objection to Exhibit 2020, Petitioner may not seek to exclude this exhibit in its Motion to Exclude Evidence.  After considering Petitioner's objections to the remaining exhibits, for the reason's set forth below, we deny or dismiss as moot Petitioner's Motion to Exclude Evidence with respect to those exhibits.

*i.      Authentication*

Petitioner argues that Patent Owner's declarant fails to identify the custodian or source of the Exhibits 2004 and 2006–2008.  Pet. Mot. 12.  As Patent Owner notes, however, "a document may be authenticated in a variety of ways, including by '[t]estimony of a [w]itness with [k]nowledge [] that an item is what it is claimed to be.'"  PO Opp. 8 (quoting FRE 901(b)(1)).  Here, Patent Owner provides direct testimony from Mr. Heslin, the author of the letters and the enclosures comprising Exhibits 2004 and 2006–2008, testifying that each of these items is what it is claimed to be.  *Id.* at 9–10 (citing Ex. 2012 ¶¶ 7, 10, 11; Ex. 2024, 35:19–36:5).  We are persuaded that these exhibits are authenticated adequately, and, with respect to these exhibits, we *deny* Petitioner's Motion to Exclude Evidence as

IPR2014-00233
Patent 6,030,384

unauthenticated evidence.

### ii.     Hearsay

Petitioner further argues that Exhibits 2004 and 2006–2008 should be excluded as inadmissible hearsay.  Pet. Mot. 13.  In particular, Petitioner argues that the draft application, which is an enclosure to the letter dated January 28, 1998 (Ex. 2004), is relied upon by Patent Owner for the truth of what is asserted therein, namely conception of the instrument recited in the challenged claims as of January 28, 1998.  *Id.* (citing Ex. 2010 ¶ 11).  To the extent that the draft application is offered for the truth of what is asserted therein, we did not reach and do not address the date of conception in this Decision.  *See supra* Section II.B.3.b.  Consequently, we do not consider the truth of the content of the draft application.

Nevertheless, Patent Owner contends that the January 28, 1998, letter and enclosure (Ex. 2004), as well as the other challenged exhibits, are not offered for the truth of the matter asserted therein.  PO Opp. 10.  Instead, Patent Owner contends that the significance of these exhibits, especially, Ex. 2004, is "solely in the fact that it is made, no issue is raised as to the truth of anything asserted, and the statement is not hearsay."  *Id.* (quoting FRE 801(c), Adv. Comm. Note).  We consider Exhibit 2004 only to the extent that the date of the letter is relevant to our assessment of Dr. Nezhat's testimony regarding his diligence in constructively reducing the instruments recited in the challenged claims to practice.  Therefore, to the extent that Patent Owner relies on these exhibits only for the purpose of demonstrating that an activity occurred on a particular date, we are not persuaded that these exhibits are inadmissible hearsay, and we *deny* Petitioner's Motion to Exclude Evidence as to inadmissible hearsay.

### iii.     Incomplete

Petitioner further argues that the record of communications between Mr.

IPR2014-00233
Patent 6,030,384

Heslin and Dr. Nezhat is incomplete.  Pet. Opp. 5.  Generally, Petitioner argues that Patent Owner did not produce the complete file of prosecution correspondence between Mr. Heslin and Dr. Nezhat and that the correspondence that Patent Owner did produce was incomplete.  In particular, Petitioner argues that Patent Owner did not file or produce a facsimile transmission of November 1997 from Dr. Nezhat to Mr. Heslin describing the invention.  *Id.*

FRE 106 provides that "[i]f a party introduces all or part of a writing or recorded statement, an adverse party may require the introduction, at that time, of any other part –or any other writing or recorded statement –that *in fairness* ought to be considered at the same time" (emphasis added).  *See* PO Opp. 13.  FRE 106 does not require Patent Owner to produce all documents in a given file.  *Id.* Regarding the facsimile transmission of November 1997, Petitioner argues that particular facsimile transmission is relevant to the conception of the instruments recited in the challenged claims prior to JP'551's publication date, i.e., February 10, 1998.  Pet. Mot. 14.  Nevertheless, we did not reach and do not address the date of conception in this Decision.  *See supra* Section II.B.3.b.  Therefore, the content of the facsimile transmission of November 1997 is not relevant to the Decision in this case.

Finally, to the extent that Petitioner argues that the lack of a complete correspondence file in the record is prejudicial to Petitioner (*see* Pet. Mot. 14–15), we note that, in this case, a "complete" record has not been shown to exist (*see* Ex. 2023, 42:18–43:24; Ex. 2024, 25:7–18).  Consequently, the incompleteness of the file goes to the weight that we accord to Patent Owner's evidence and not to the admissibility of that evidence.

Therefore, for the reasons set forth above, we deny or dismiss as moot Petitioner's Motion to Exclude Evidence with respect to Exhibits 2002–2004,

IPR2014-00233
Patent 6,030,384

2006–2008, 2016, and 2020.

　　2.　*Patent Owner's Motion to Exclude Evidence*

Patent Owner filed a Motion to Exclude Evidence (Paper 43 ("PO Mot.")); Petitioner filed an Opposition to Patent Owner's Motion to Exclude Evidence (Paper 46 ("Pet. Opp.")); and Patent Owner filed a Reply to Petitioner's Opposition to the Motion to Exclude Evidence (Paper 48 ("PO Reply to Opp.")). As an initial matter, Petitioner argues that Patent Owner's Motion to Exclude Evidence, filed on January 20, 2015, was untimely filed. Pet. Opp. 1. For the reasons set forth below, we agree and deny Patent Owner's Motion to Exclude Evidence as untimely filed.

In our Scheduling Order, we set DUE DATE 4, the deadline for either party to file any motion to exclude evidence, as January 20, 2015. Paper 17, 5. This date was selected by us for DUE DATE 4 because January 19, 2015, was the date of the 2015 Martin Luther King, Jr. Day Federal Holiday. The Scheduling Order further stated that

> This order sets due dates for the parties to take action after institution of the proceeding. *The parties may stipulate to different dates for DUE DATES 1 through 5 (earlier or later, but no later than DUE DATE 6).* A notice of the stipulation, specifically identifying the changed due dates, must be promptly filed. The parties may not stipulate to an extension of DUE DATES 6 and 7.

*Id.* at 1 (emphasis added). On August 21, 2014, the parties filed a Notice of Stipulation to Adjust Schedule Due Dates 1–4, which among other dates changed DUE DATE 4 from January 20, 2015, to January 19, 2015. Paper 24, 3. Counsel for each party signed the Notice of Stipulation. *Id.* at 4.

Petitioner timely filed its Motion to Exclude Evidence on January 19, 2015, i.e., stipulated DUE DATE 4; but Patent Owner did not. Instead, Patent Owner

42

IPR2014-00233
Patent 6,030,384

filed its Motion to Exclude Evidence on January 20, 2015. Patent Owner now contends that, despite the parties' stipulation changing DUE DATE 4 to January 19, 2015, the DUE DATE for filing Patent Owner's Motion to Exclude Evidence *remained* January 20, 2015, because January 19, 2015, was a Federal holiday. PO Reply to Opp. 1.

> Under 35 U.S.C. § 21(b),
>
> [w]hen the day, or the last day, for taking any action or paying any fee in the United States Patent and Trademark Office falls on Saturday, Sunday, or a Federal holiday within the District of Columbia, the action may be taken, or the fee paid, on the next succeeding secular or business day.

We understand that the statute applies to deadlines set by statute, rule or order; not to *different* dates stipulated to by the parties. Similarly, under 37 C.F.R. § 1.7(a), when a deadline falls on a Federal holiday, action may be taken "on the next succeeding business day." Section 1.7, however, applies to deadlines "fixed by statute or by or under this part" of this chapter.[16] *See* 37 C.F.R. § 42.1(a) ("[Section 1.7] of this chapter also appl[ies] to proceedings before the Board, as do other sections of part 1 of this chapter that are incorporated by reference into this part."). Although the Scheduling Order is an order made pursuant to 37 C.F.R. § 42.5(c), the Scheduling Order permits the parties to change the DUE DATES set therein to *"different"* dates by stipulation. Paper 17, 1. Moreover, given that filings with the Board may be made electronically (*see* 37 C.F.R. § 42.6(b)(1)) and the Patent Review Processing System accepts filings twenty-four hours a day and seven days a week, we only require that stipulated DUE DATES 1–5 may be

---

[16] S. Rept. No. 82-1979, at 2407 (1952) (With respect to 35 U.S.C. § 21, "'[f]ixed by statute' is omitted from the corresponding section of the existing statute *as unnecessary*. Saturday is added as a day on which action need not be taken."; emphasis added).

43

"earlier or later [than the date set in the Scheduling Order], but no later than DUE DATE 6." Paper 17, 1. Within these limits, the Board observes stipulated dates, and stipulated dates are binding on the parties by their agreement.

Here, the parties stipulated to January 19, 2015, as DUE DATE 4. As noted above, Patent Owner's Motion to Exclude Evidence was not filed on or before stipulated DUE DATE 4, and Patent Owner has provided no reason for its delay in filing its Motion to Exclude Evidence, which warrants our acceptance of its untimely Motion to Exclude Evidence.[17] Therefore, we *deny* Patent Owner's untimely Motion to Exclude Evidence.

### D.     *Improper Filing of Demonstrative Exhibits*

The panel "may expunge any paper directed to a proceeding . . . that is not authorized under this part or in a Board order or that is filed contrary to a Board order." 37 C.F.R. § 42.7(a). After reviewing Exhibit 1024–1028, we determine that these exhibits are not authorized by this part or in a Board order or are contrary to a Board order.

According to Petitioner, "Exhibit 1024 contains a table and two calendars that [purport to] summarize all of the evidence (or lack thereof) related to Patent Owner's efforts to show conception and diligence towards constructive reduction to practice." Pet. Opp. 9. In particular, in Exhibit 1024, Petitioner characterizes certain periods as "UNEXPLAINED INACTIVITY." This issue is disputed. *See* PO Resp. 15–17; Pet. Reply 3–6. Similarly, Exhibit 1026 is a PowerPoint

---

[17] Patent Owner contends that Petitioner is not prejudiced by Patent Owner's late filing of the Motion to Exclude Evidence. PO Reply to Opp. 1–2. Nevertheless, as a general matter, if we accepted Patent Owner's late filing, Petitioner would have one day less to prepare its opposition to Patent Owner's Motion to Exclude Evidence than Patent Owner would have to prepare its opposition to Petitioner's Motion to Exclude Evidence. Pet. Opp. 2.

IPR2014-00233
Patent 6,030,384

presentation purporting to show a side-by-side comparison of the disclosures of the draft patent applications that Mr. Heslin sent to Dr. Nezhat on January 28, 1998, and April 13, 1998. However, on slides 2 and 3 of this presentation, Petitioner includes argument in the form of a large red X asserting that the draft patent application dated January 28, 1998, contained no disclosure corresponding to that included in the draft patent application dated April 13, 1998. This is not evidence, but, instead, is Petitioner's argument regarding how we should interpret the evidence presented by Patent Owner. *See* PO Resp. 16. Pursuant to 37 C.F.R. § 42.24(c)(1), a Reply to a Patent Owner Response to Petition is limited to fifteen pages. Consequently, we conclude that Exhibits 1024 and 1026 contain improper argument in excess of the page limit of Petitioner's Reply; and we expunge Exhibits 1024 and 1026. *See Medtronic, Inc. v. Robert Bosch Healthcare Systems, Inc.*, Case IPR2014-00488, slip op. at 3 (PTAB Jan. 14, 2015) (Paper 42).

Petitioner also contends that Exhibits 1024–1028 are "demonstrative exhibits." Pet. Opp. 12 (Ex. 1024 and Ex. 1025), 13 (Ex. 1026), 15 (Ex. 1027 and Ex. 1028). As indicated in the Board's Office Trial Practice Guide, demonstrative exhibits may be presented at the oral hearing. 77 Fed. Reg. 48756, 48768 (Aug. 14, 2012). However, the filing of demonstrative exhibits was not authorized by our rules or by any order in this case. Moreover, our order granting the parties' requests for an oral hearing expressly prohibits the filing of demonstrative exhibits without our prior authorization. Paper 45, 4 ("The parties shall not file any demonstrative exhibits in this case without prior authorization from the Board."); *see* PO Reply to Opp. 5. Because Petitioner did not request authorization to file and we did not authorize the filing of these demonstrative exhibits at DUE DATE 3, we also expunge Exhibits 1025–1028 for this reason. *See C&D Zodiac, Inc. v.*

IPR2014-00233
Patent 6,030,384

*B/E Aerospace, Inc.*, Case IPR2014-00727, slip op. at 3 (PTAB Mar. 3, 2015)
(Paper 30).

## III. CONCLUSION

Based on the foregoing discussion, we conclude that Petitioner has
demonstrated by a preponderance of the evidence that claims 1, 4–6, 8, 9, 11, 12,
38, 41–44, 46, 47, and 49 of the '384 patent are unpatentable in view of JP'551,
alone or in combination with FR'149.

## IV. ORDER

In consideration of the foregoing, it is

ORDERED that Petitioner has shown by a preponderance of the evidence
that claims 1, 4–6, 8, 9, 11, 12, 38, 41–44, 46, 47, and 49 of the '384 patent are
unpatentable under 35 U.S.C. § 102(b) or 103(a) over JP'551;

FURTHER ORDERED that Petitioner has shown by a preponderance of the
evidence that claims 1, 4–6, 8, 9, 11, 12, 43, 44, 46, and 47 of the '384 patent are
unpatentable under 35 U.S.C. § 103(a) over JP'551 and FR'149;

FURTHER ORDERED that Petitioner's Motion to Exclude Evidence is
*dismissed as moot* with respect to Exhibits 2003, 2004, and 2016 and *denied or
dismissed as moot* with respect to Exhibits 2002, 2006–2008, and 2020;

FURTHER ORDERED that Patent Owner's Motion to Exclude Evidence is
*denied* as untimely filed;

FURTHER ORDERED that Exhibits 1024–1028 are expunged; and

FURTHER ORDERED that, because this is a final decision, parties to the
proceeding seeking judicial review of the decision must comply with the notice
and service requirements of 37 C.F.R. § 90.2.

IPR2014-00233
Patent 6,030,384


PETITIONER:

Deborah E. Fishman
KAYE SCHOLER LLP
DFishmanPTAB@kayescholer.com


Steven I. Weisburd
ARENT FOX LLP
steven.weisburd@arentfox.com

Robert E. Bugg
DICKSTEIN SHAPIRO LLP
buggr@dicksteinshapiro.com

PATENT OWNER:

Jason S. Angell
Robert E. Freitas
Daniel J. Weinberg
FREITAS ANGELL & WEINBERG LLP
jangell@fawlaw.com
rfreitas@fawlaw.com
dweinberg@fawlaw.com



US006030384A

# United States Patent [19]

## Nezhat

[11] **Patent Number:** 6,030,384

[45] **Date of Patent:** Feb. 29, 2000

[54] **BIPOLAR SURGICAL INSTRUMENTS HAVING FOCUSED ELECTRICAL FIELDS**

[76] Inventor: **Camran Nezhat**, 240 Mountain Wood La., Woodside, Calif. 94062

[21] Appl. No.: **09/071,689**

[22] Filed: **May 1, 1998**

[51] Int. Cl.⁷ ..................................................... **A61B 17/39**

[52] U.S. Cl. ................................................. **606/48**; 606/51

[58] Field of Search .................................. 606/48, 50–52, 606/45, 49

[56] **References Cited**

U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 3,920,021 | 11/1975 | Hiltebrandt . |
| 4,016,886 | 4/1977 | Doss et al. .............................. 128/422 |
| 4,041,952 | 8/1977 | Morrison, Jr. et al. . |
| 4,043,342 | 8/1977 | Morrison, Jr. . |
| 4,671,274 | 6/1987 | Sorochenko . |
| 5,098,431 | 3/1992 | Rydell . |
| 5,151,102 | 9/1992 | Kamiyama et al. . |
| 5,207,691 | 5/1993 | Nardella . |
| 5,217,030 | 6/1993 | Yoon . |
| 5,217,460 | 6/1993 | Knoepfler .................................. 606/52 |
| 5,267,998 | 12/1993 | Hagen . |
| 5,269,780 | 12/1993 | Roos . |
| 5,269,782 | 12/1993 | Sutter . |
| 5,281,216 | 1/1994 | Klicek . |
| 5,282,799 | 2/1994 | Rydell . |
| 5,290,287 | 3/1994 | Boebel et al. . |
| 5,295,990 | 3/1994 | Levin . |
| 5,300,087 | 4/1994 | Knoepfler . |
| 5,324,289 | 6/1994 | Eggers . |

| | | |
|---|---|---|
| 5,330,471 | 7/1994 | Eggers . |
| 5,336,229 | 8/1994 | Noda . |
| 5,342,381 | 8/1994 | Tidemand . |
| 5,352,223 | 10/1994 | McBrayer et al. . |

(List continued on next page.)

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| 598149 | 7/1925 | France . |
| 197711 | 11/1977 | Russian Federation . |

*Primary Examiner*—Linda C. M. Dvorak
*Assistant Examiner*—Roy Gibson
*Attorney, Agent, or Firm*—Townsend and Townsend and Crew LLP

[57] **ABSTRACT**

A bipolar surgical device includes a pair of actuable jaws. A first electrode member which usually includes a line of electrically coupled tissue penetrating elements is formed on one of the jaws, and a second electrode member which usually includes a line of electrically coupled tissue penetrating elements is formed on the same or the other jaw. The electrode members are laterally spaced-apart and arranged in a parallel, usually linear manner so that the lateral distance therebetween remains generally constant. In operation, tissue may be grasped between the jaws so that the electrode members contact and/or the tissue penetrating elements enter into the tissue. By energizing the electrode members at opposite polarities using a high frequency energy source, tissue between the jaws will be heated, coagulated, and/or necrosed, while heating of tissue outside of the lines will be minimized.

**49 Claims, 6 Drawing Sheets**



**6,030,384**
Page 2

### U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 5,352,235 | 10/1994 | Koros et al. . |
| 5,356,408 | 10/1994 | Rydell . |
| 5,383,876 | 1/1995 | Nardella . |
| 5,391,166 | 2/1995 | Eggers . |
| 5,395,369 | 3/1995 | McBrayer et al. . |
| 5,396,900 | 3/1995 | Slater et al. . |
| 5,403,312 | 4/1995 | Yates et al. . |
| 5,417,687 | 5/1995 | Nardella et al. . |
| 5,423,814 | 6/1995 | Zhu et al. . |
| 5,443,463 | 8/1995 | Stern et al. . |
| 5,445,638 | 8/1995 | Rydell et al. . |
| 5,456,684 | 10/1995 | Schmidt et al. . |
| 5,458,598 | 10/1995 | Feinberg et al. . |
| 5,462,546 | 10/1995 | Rydell . |
| 5,469,312 | 11/1995 | Klicek . |
| 5,482,054 | 1/1996 | Slater et al. . |
| 5,484,435 | 1/1996 | Fleenor et al. . |
| 5,484,436 | 1/1996 | Eggers et al. . |
| 5,496,317 | 3/1996 | Goble et al. . |
| 5,514,134 | 5/1996 | Rydell et al. . |
| 5,527,313 | 6/1996 | Scott et al. ................................. 606/51 |
| 5,531,744 | 7/1996 | Nardella et al. . |
| 5,540,684 | 7/1996 | Hassler, Jr. . |
| 5,540,685 | 7/1996 | Parins et al. . |
| 5,542,945 | 8/1996 | Fritzsch . |
| 5,549,606 | 8/1996 | McBrayer et al. . |
| 5,558,100 | 9/1996 | Cox . |
| 5,558,671 | 9/1996 | Yates . |
| 5,569,243 | 10/1996 | Kortenbach et al. . |
| 5,573,535 | 11/1996 | Viklund . |
| 5,578,052 | 11/1996 | Koros et al. . |
| 5,599,350 | 2/1997 | Schulze et al. . |
| 5,603,711 | 2/1997 | Parins et al. . |
| 5,624,452 | 4/1997 | Yates . |
| 5,626,578 | 5/1997 | Tihon . |
| 5,637,110 | 6/1997 | Pennybacker et al. . |
| 5,637,111 | 6/1997 | Sutcu et al. . |
| 5,658,281 | 8/1997 | Heard . |
| 5,662,680 | 9/1997 | Desai . |
| 5,665,085 | 9/1997 | Nardella . |
| 5,665,100 | 9/1997 | Yoon . |
| 5,667,526 | 9/1997 | Levin . |
| 5,669,907 | 9/1997 | Platt, Jr. et al. . |
| 5,674,184 | 10/1997 | Hassler, Jr. . |
| 5,674,220 | 10/1997 | Fox et al. . |
| 5,681,282 | 10/1997 | Eggers et al. . |
| 5,683,385 | 11/1997 | Kortenbach et al. . |
| 5,683,388 | 11/1997 | Slater . |
| 5,688,270 | 11/1997 | Yates et al. . |
| 5,693,051 | 12/1997 | Schulze et al. . |
| 5,697,949 | 12/1997 | Giurtino et al. . |
| 5,700,261 | 12/1997 | Brinkerhoff . |
| 5,702,390 | 12/1997 | Austin et al. . |
| 5,707,369 | 1/1998 | Vaitekunas et al. . |
| 5,709,680 | 1/1998 | Yates et al. . |
| 5,713,896 | 2/1998 | Nardella . |
| 5,718,703 | 2/1998 | Chin . |
| 5,733,283 | 3/1998 | Malis et al. . |
| 5,735,848 | 4/1998 | Yates et al. . |
| 5,735,849 | 4/1998 | Baden et al. . |
| 5,741,285 | 4/1998 | McBrayer et al. . |
| 5,743,906 | 4/1998 | Parins et al. . |
| 5,755,717 | 5/1998 | Yates et al. . |
| 5,891,142 | 4/1999 | Eggers et al. .............................. 606/51 |



(PRIOR ART)
# FIG. 1A



(PRIOR ART)
# FIG. 1B



FIG. 2A



FIG. 2D



FIG. 2B



FIG. 2E



FIG. 2C



FIG. 2F



FIG. 3A



FIG. 3B



## FIG. 3C



## FIG. 4

**U.S. Patent**    Feb. 29, 2000    Sheet 5 of 6    6,030,384



FIG. 5



FIG. 6



FIG. 7



**FIG. 8**

6,030,384

<div style="display:flex">
<div>

1

## BIPOLAR SURGICAL INSTRUMENTS HAVING FOCUSED ELECTRICAL FIELDS

### BACKGROUND OF THE INVENTION

1. Field of the Invention

The present invention relates generally to medical devices and methods. More particularly, the present invention relates to the structure and use of bipolar forceps and other instruments for coagulating, cutting, and necrosing tissue.

Electrosurgery refers broadly to a class of medical procedures which rely on the application of high frequency electrical energy, usually radio frequency energy, to patient tissue to achieve such tasks, such as cutting, coagulation, hyperthermia, necrosis, and the like. Of particular interest to the present invention, bipolar electrosurgical devices rely on contacting electrodes of different polarity in close proximity to each other against or into tissue. For example, bipolar forceps 100 (FIGS. 1 and 2) have been used for cutting and coagulating tissue, where the opposed jaws 102 and 104 of the forceps are connected to different poles of an electrosurgical power supply. The high frequency electrical current thus flows from one jaw to the other through the tissue present therebetween. Use of such bipolar forceps is effective for a number of purposes and advantageous in that its effect is generally limited to the tissue held between the jaws. Heating, however, is not totally limited to such intermediate tissue, and in some instances heating of adjacent tissues can be problematic. Such heating occurs because the current flows not only between the jaws but also laterally outward, as shown by flux lines F in FIG. 1B.

Various improvements to bipolar forceps have been proposed. For example, the placement of pins or other tissue-penetrating elements onto the tissue-engaging surface(s) of either or both jaws has been suggested for a variety of purposes. Regardless of the intended purpose, the placement of tissue-penetrating elements on the jaw(s) can marginally focus the current density and somewhat lessen heating of adjacent tissues. Such prior designs employing tissue-penetrating elements, however, still cause unwanted heating of adjacent tissues in at least certain circumstances.

A second problem with conventional bipolar forceps is limited power delivery. With conventional forceps, jaws having a length of about 20 mm and a width of about 5 mm can usually deliver only 25 W of current without causing charring of the tissue. Charring greatly increases electrical resistance through the tissue and can result in premature termination of the treatment. With such a low power level, the time to fully coagulate the tissue can be excessive.

It would therefore be desirable to provide still further improved bipolar forceps and other electrosurgical device designs. In particular, it would be desirable to provide bipolar forceps which provide a very high degree of focused heating, i.e., provide heating of tissue between the jaws with minimized heating of tissue adjacent to the jaws. It would be further desirable to provide bipolar forceps which can deliver higher current flows and densities to the tissue being treated without charring the tissue and terminating the current flow. Such device designs should be relatively simple and easy to fabricate. The devices and methods should be compatible with conventional electrosurgical power supplies and usable in a wide variety of procedures, including cutting, coagulation, and necrosis, where the localized and specific heating of patient tissues is desired. At least some of these objectives will be met by the invention described hereinafter.

</div>
<div>

2

2. Description of the Background Art

Bipolar forceps having penetrating elements on opposed jaws thereof are described in U.S. Pat. Nos. 5,527,313 and 5,217,460; Soviet Union Patent Publication SU197711; and French Patent No. 598,149. A radio frequency tumor heating device comprising parallel electrode arrays of opposite polarity is described in U.S. Pat. No. 4,016,886.

### SUMMARY OF THE INVENTION

The present invention provides improved bipolar surgical instruments, such as forceps, graspers, or the like, which comprise a pair of opposed jaws at the distal end of a shaft. The present invention is directed at a unique electrode configuration on either or both of the jaws which will provide improved current focussing characteristics and lessened heating of adjacent tissues. In particular, electrode members on either or both of the jaws will be laterally spaced apart from each other when the jaws are closed so that current will flow from one electrode to the other with minimum current flow outside of the region defined between the electrodes. optionally, a pair of electrodes can be provided on each jaw with a positive and negative electrode on one jaw and a positive and negative electrode on the other jaw, with the two positive electrodes and the two negative electrodes being aligned with each other when the jaws are closed to defined the desired focussed current flow.

Preferably, at least one of the electrode members will include tissue penetrating elements. Usually a first line of electrically coupled tissue penetrating elements will be provided on a first electrode member, and a second line of electrically coupled tissue penetrating elements will be provided on a second electrode member. Third and fourth lines of electrically coupled tissue penetrating elements will preferably be provided when third and fourth electrode members are provided on the instrument. The first and second lines (and optionally third and fourth lines) of tissue penetrating elements will be electrically isolated from each other to permit energization in a bipolar manner, i.e., each line of electrically coupled tissue penetrating elements may be separately connected to the opposite pole of a conventional electrosurgical power supply. The shaft includes or comprises an actuating mechanism for moving the jaws between opened and closed configurations, where the lines of tissue penetrating elements lie parallel to and spaced-apart from each other when the jaws are closed. In this way, the jaws can be closed on a target tissue structure, such as a fallopian tube, artery, vein, and the like, in order to penetrate the lines of elements into the tissue. By then applying high frequency electrical energy to the lines in a bipolar manner, current flux will be focused to within that portion of the tissue which lies between the adjacent lines, with minimum heating of tissue outside of the parallel lines. Usually, but not necessarily, the lines will both be straight. Alternatively, the lines could be nonlinear, e.g., curved, serpentine, zig-zag, or the like, so long as the patterns are similar and the lateral spacing between adjacent points on the lines remains substantially constant. Preferably, the spacing between the adjacent lines of tissue penetrating elements will be in the range from 0.5 mm to 10 mm, more preferably from 2 mm to 5 mm.

The lines of tissue penetrating elements may be on the same jaw or on different jaws. When the lines are on the same jaw, it is necessary to provide insulation so that each line is electrically isolated from the other, while the plurality of tissue penetrating elements in an individual line remain electrically coupled. Electrical conductors will be provided

</div>
</div>

6,030,384

3

within the shaft in order to permit attachment of each line to opposite polarity connections on an electrosurgical power supply. When present on different jaws, the lines of tissue penetrating elements may be isolated from each other by maintaining appropriate electrical isolation between the jaws and/or at either or both ends of the tissue penetrating elements.

The tissue penetrating elements may have a wide variety of different configurations. Most commonly, they will be in the form of a pin or other rod-like tissue-penetrating electrode, usually having a sharpened distal end to facilitate penetration into tissue. Alternatively, an appropriate cutting current could be applied to the electrodes in order to facilitate tissue penetration while the jaws are being closed. Each line of tissue penetrating elements may contain from 2 to 50 individual elements, usually from 6 to 10. The elements may extend over a length on the jaw(s) in the range from 1 mm to 10 mm, usually from 2 mm to 5 mm, with spacing between individual elements being in the range from 0.5 mm to 3 mm, usually from 0.5 mm to 2 mm. The height of the tissue penetrating elements (corresponding to the depth of tissue penetration) will usually be in the range from 1 mm to 10 mm, preferably from 2 mm to 5 mm, while the diameter of the elements will typically from 0.1 mm to 10 mm, usually from 0.5 mm to 0.5 mm.

Optionally, either or both of the jaws may be perforated or otherwise provided with passages in order to permit the release of steam which is a byproduct of tissue heating. A mechanism will be provided on the shaft for actuating the jaws, i.e., opening and closing the jaws so that they may grasp tissue therebetween. Exemplary actuating mechanisms include scissors, camming mechanisms, linear/pivot actuators, and the like.

Methods according to the present invention rely on grasping tissue between a first jaw and a second jaw. A high frequency energy is then applied between a first line of tissue penetrating elements on one of the jaws and a second line of tissue penetrating elements on the same or a different jaw. The tissue penetrating element lines are parallel and spaced-apart from each other, generally as described above. The high frequency energy will preferably be applied to the tissue at a level and for a time sufficient to necrose substantially all tissue between the lines without causing substantial damage to other tissue, i.e., tissue outside of the lines. Typically, the high frequency energy will be applied at a frequency in the range from 100 kHz to 1 MHz, preferably from 400 kHz to 500 kHz. The energy will be applied at a power from 25 W to 200 W, preferably from 50 W to 100 W, and for a time in the range from 5 seconds to 5 minutes, usually from 10 seconds to 40 minutes.

BRIEF DESCRIPTION OF THE DRAWINGS

FIGS. 1A and 1B illustrate use of conventional bipolar forceps for coagulating a tubular structure in the body.

FIGS. 2A–2F illustrate a plurality of alternative electrode configurations according to the method of the present invention.

FIG. 3A is a perspective view of a pair of actuable jaws carrying two lines of electrically coupled tissue penetrating elements in accordance with the principles of the present invention.

FIG. 3B is a side, elevational view of the jaws of FIG. 1, shown with the jaws closed.

FIG. 3C is a cross-sectional view taken along line 3—3 of FIG. 2.

FIG. 4 is an alternative cross-sectional view of a pair of jaws constructed in accordance with the principles of the present invention.

4

FIG. 5 illustrates a scissors-type actuating mechanism that can be used with the jaws of FIG. 1.

FIG. 6 illustrates a pair of resiliently-mounted jaws that can be opened and closed with a cam surface, where the jaws incorporate tissue-penetrating elements according to the principles of the present invention.

FIG. 7 illustrates an alternative jaw actuating mechanism which may be utilized in the devices of the present invention.

FIG. 8 illustrates use of the jaws of FIG. 1 in treating tissue according to the method of the present invention.

DESCRIPTION OF THE SPECIFIC EMBODIMENTS

According to the present invention, bipolar surgical instruments will include at least two and up to four or more laterally spaced-apart electrode members disposed on a pair of actuable jaws. By properly positioning the electrode members relative to each other, radio frequency energy applied to tissue disposed between the jaws can be focused within a well-defined region between the electrode members. In contrast to prior art devices and methods, where electrodes of opposite polarity are generally engaged against directly opposed tissue surfaces, the present invention will position at least one positive electrode and at least one negative electrode on and/or into laterally spaced-apart sites on opposed tissue surfaces.

The electrode members may be configured in a wide variety of patterns and designs, some of which are illustrated in FIGS. 2A–2E. Most simply, one jaw 200 may carry a first electrode member 202 which is laterally spaced-apart from a second electrode member 204, where the electrode members are connectable to opposite poles of a power supply. An opposed jaw 206 may be free from electrodes of any sort. The jaws 200 and 206 will be actuable, as described in more detail hereinafter, so the tissue may be grasped between two opposed tissue-engaging surfaces 208 and 210. When tissue is grabbed between the jaws 200 and 206, current flow will be generally limited to between the electrode members 202 and 204.

While the electrode member configuration of FIG. 2A is functional, the current flow pattern between the electrodes can be improved by having a first electrode member 214 on a first jaw 216 and a second electrode member 218 on a second jaw 220 as illustrated in FIG. 2B. As with the configuration of FIG. 2A, the electrode members 214 and 218 of FIG. 2B will generally limit current flow so that it does not extend significantly to tissue outside the lateral boundaries of the jaws 216 and 220. By placing the electrode members 214 and 218 on opposed jaws, enhanced current flow through the tissue may be achieved.

A further alternative improved configuration of the electrode members according to the present invention is illustrated in FIG. 2C. First electrode member 230 and second electrode member 232 are each carried on a first jaw 234, in a manner similar to the embodiment of FIG. 2A. The electrode members 230 and 232, however, each include a line of tissue-penetrating elements thereon. The electrode members 202 and 204 in FIG. 2A are generally linear electrodes having a width and length within the ranges set forth above. Such electrodes will form a flat contact or interface with the tissue which is engaged between the jaws 200 and 206. By providing tissue-penetrating elements 236 and 238, as illustrated in FIG. 2C, two advantages are achieved. First, the total electrode area in contact with the tissue can be greatly enhanced, typically from two-fold to

6,030,384

5                                                                              6

10-fold, or greater. Moreover, by extending the electrode "boundaries" into the tissue, the ability to achieve uniform current flux within the tissue is improved and the containment of that current flux within the target region is also enhanced. The embodiment of FIG. 2C will include an opposed jaw 240 which is free from electrodes.

A slightly modified configuration for tissue penetrating elements 242 and 244 is illustrated in FIG. 2D. Instead of carrying both lines of tissue penetrating elements 242 and 244 on a single jaw, the first line 242 is carried on an upper jaw 246 and the second line 244 is carried on a lower jaw 248. The advantages regarding increased electrode area and current flux containment, however, are generally comparable to those achieved with the embodiment of FIG. 2C.

Yet another alternative for the electrode member configuration is illustrated in FIG. 2E. Jaws 250 and 252 each carry pairs of laterally spaced-apart members 254, 256, 258 and 260. The electrode members can be adapted for connection to a power supply so that laterally spaced-apart pairs of electrodes will have opposite polarity when the instrument is powered. For example, electrodes 254 and 258 may have a first polarity while electrodes 256 and 260 may have a second polarity. Alternatively, but less preferably, electrodes 254 and 260 may have a first polarity while electrodes 258 and 256 may have a second polarity. The latter configuration will be generally less effective at containing current flow than the former configuration since pairs of oppositely energized electrodes will directly oppose each other when the instrument is engaged against tissue.

Yet another electrode configuration is illustrated in FIG. 2F. There, each jaw 270 and 272 carries a pair of electrode members 274, 276, 278, 280. Each of the electrode members, in turn, carries a line of tissue-penetrating elements 282, 284, 286, 288. The tissue-penetrating elements are arranged so that their distal tips will engage each other when the jaws 270 and 272 are closed together. Opposed pairs of electrode members 274/278 and 276/280 will have the same polarity, i.e. the laterally spaced-apart pairs will be of opposite polarity. In many ways, the operation of the embodiment of FIG. 2F will be the same as that of both FIG. 2C and FIG. 2D. The embodiment of FIG. 2F may also be modified by axially spacing apart the opposed penetrating elements 282/286 and 284/288 so that the elements penetrate fully to the opposed jaw 270 or 272. A variety of other electrode modifications will also be possible within the scope and spirit of the present invention.

Referring now to FIGS. 3A–3C, a first exemplary pair of jaws 10 and 12 which may be utilized for grasping tissue and applying high frequency energy according to the methods of the present invention will be described. The jaws 10 and 12 will be actuable or reciprocatable in a manner conventional for forceps, graspers, and other similar types of medical devices. Specific shaft designs which provide for such actuation will be described hereinafter in connection with FIGS. 5–7.

A first line 20 comprising seven tissue penetrating pins 22 is disposed on one side of the lower jaw 10 and a second line 30 of tissue penetrating pins 32 is disposed on the other side of the lower jaw. The first line 20 of pins 22 is electrically coupled by an electrically conductive strip 24 into which the pins are attached. Similarly, a second electrically conductive strip 34 is disposed on the other side of the jaw and electrically couples the second line 30 of pins 32. Each of the electrically conductive strips 24 and 32 will be attached to conductors (not shown) which extend proximally down the shaft of the device and which provide for electrical attachment of the lines 20 and 30 to a conventional electrosurgical power supply.

The electrically conductive strips 24 and 34 will be electrically isolated from each other. For example, the strips 24 and 34 may be imbedded in an insulating material, such as a ceramic, plastic, or the like. Alternatively, an insulating layer may be formed around the strips 24 so that they are electrically isolated from the lower jaw 10. The upper jaw 12 may also be formed from a ceramic or other electrically insulating material to assure that the pins 22 and 32 are not shorted by contact with the upper jaw. The pins 22 and 32 and strips 24 and 34 will be formed from an electrically conductive material, typically a metal such as stainless steel, gold, silver, or the like. The dimensions, number, spacing, and other characteristics of the pins 22 and 32 will be within the ranges set forth above. While shown in a straight line, the pins 22 and 32 could also be arranged in the other patterns set forth above.

The embodiment of FIGS. 3A–3C shows both lines 20 and 30 of tissue penetrating elements 22 and 32 being connected to the same jaw. The present invention would also cover embodiments where the lines of tissue penetrating elements are connected to opposite jaws, as shown in FIG. 4. There, a first line of pins 40 are mounted within a conductive strip 44 in a lower jaw 46, while a second line of tissue penetrating elements 50 are mounted in an electrically conductive strip 54 in an upper jaw 56. The individual tissue penetrating elements 40 and 50 are thus coupled to each other within each line, but the two lines are electrically isolated, so that the result is a pair of electrically isolated lines of tissue penetrating elements, as with the first embodiment.

Referring now to FIGS. 5–7, the present invention can rely on virtually any jaw-actuating mechanism of a type utilized in medical devices. For example, the mechanism can be a simple scissors mechanism, as shown in FIG. 5, where the jaws 10 and 12 are pivotally connected to actuating levers 60 and 62. Opening and closing of the levers 60 and 62 will open and close the jaws in a conventional manner.

Jaws 10' and 12' can also be mounted within a hollow tube 70 having cam surfaces 72 formed at its distal end. The jaws 10' and 12' are resiliently mounted on a rod 74 so that the jaws may be axially translated relative to the cam surfaces 72 to open the jaws (as shown in full line) and close the jaws (as shown in broken line) in FIG. 6.

As a third common alternative, jaws 10" and 12" may be formed at the distal end of a tubular actuator 80. The jaw 10" which is free from tissue penetrating elements is integrally formed at the end of the tube 80. The moveable jaw 10" having the tissue penetrating elements is pivotally attached and is actuated by a rod 74 or cable 82 extending to a proximal end of the device (not shown).

The assemblies of FIGS. 6 and 7 may be manually operated by conventional proximal assemblies (not shown), such as three-ring actuators, pistol grips, or any other actuator which permits linear movement of the rod 74 or cable 82. The devices of FIGS. 6 and 7 would be particularly useful for laparoscopic, thoracoscopic, arthroscopic, or other procedures where they are to be introduced through narrow diameter cannulas, typically having shaft diameters below 12 mm, more typically below 10 mm, and sometimes 5 mm or smaller.

Referring now to FIG. 8, use of the jaws 10 and 12 of FIGS. 1–3 for treating tissue T is illustrated. The jaws 10 and 12 are actuated to grasp a tissue structure, such as an artery, vein, fallopian tube, ligament, or other tubular or elongate structure therebetween. The tissue penetrating elements 22 and 32 pierce and penetrate into the tissue T to create a

6,030,384

7

region R therebetween. The electrically conductive strips **24** and **34** are attached to an external power supply PS so that they may be energized with opposite polarities. Suitable power supplies are available from commercial suppliers, such as Valleylab, Aspen, and Bovie. The power supplies may operate with conventional sinusoidal or non-sinusoidal wave forms and may operate at fixed or controlled power levels, where voltage, current, or both may be selected. When energized at the power levels, frequencies, and durations described above, the tissue region R between the lines of penetrating elements **22** and **32** will receive a high flux of energy, causing heating, coagulation, and optionally necrosis of the tissue. Heating of the adjacent tissues outside of this region R is minimal.

While the above is a complete description of the preferred embodiments of the invention, various alternatives, modifications, and equivalents may be used. Therefore, the above description should not be taken as limiting the scope of the invention which is defined by the appended claims.

What is claimed is:

1. A bipolar surgical instrument comprising:

a shaft having a proximal end and a distal end;

a pair of opposed jaws at the distal end of the shaft;

a first electrode member on one of the jaws;

a second electrode member on one of the jaws, wherein the first and second electrode members are electrically isolated from each other; and

an actuating mechanism for moving the jaws between an opened and closed configuration, wherein electrode members lie parallel to and laterally spaced-apart from each other when the jaws are closed, wherein at least one of the electrode members comprises a plurality of tissue penetrating elements which project toward the opposed jaw.

2. A bipolar surgical instrument as in claim **1**, wherein the electrode members are laterally spaced-apart by a distance in the range from 0.5 mm to 10 mm.

3. A bipolar surgical instrument as in claim **1**, wherein the electrode members have a length in the range from 5 mm to 30 mm and a width from 0.5 mm to 5 mm.

4. A bipolar surgical instrument as in claim **1**, wherein electrode members are on the same jaw.

5. A bipolar surgical instrument as in claim **1**, wherein the first electrode member is on one jaw and the second electrode member is on the other jaw.

6. A bipolar surgical instrument as in claim **1**, wherein both electrode members comprise a plurality of tissue penetrating elements which project toward the opposed jaw.

7. A bipolar surgical instrument as in claim **1**, wherein the tissue penetrating elements have a length in the range from 1 mm to 6 mm and a diameter in the range from 0.1 mm to 1 mm.

8. A bipolar surgical instrument as in claim **6**, wherein the first and second electrode members each comprise from 5 to 20 tissue penetrating elements.

9. A bipolar surgical instrument as in claim **8**, wherein the tissue-penetrating elements are arranged in two straight lines which are parallel to each other when the jaws are closed over tissue.

10. A bipolar surgical instrument as in claim **1**, further comprising a third electrode member aligned with the first electrode member but disposed on the other jaw and a fourth electrode member aligned with the second electrode member but disposed on the other jaw.

11. A bipolar surgical instrument as in claim **1**, wherein at least one of the jaws is perforated to permit the release of steam during use.

8

12. A bipolar surgical instrument as in claim **1**, wherein the actuating mechanism comprises scissors, a camming mechanism, or a linear/pivot actuator.

13. A method for applying high frequency electrical energy to tissue, said method comprising:

grasping tissue between first jaw and a second jaw;

applying high frequency energy between a first electrode member comprising a first line of tissue-penetrating elements on one of said jaws and a second electrode member comprising a second line of tissue-penetrating elements on one of said jaws, wherein said lines of tissue penetrating elements are parallel to and laterally spaced-apart from each other when grasping the tissue.

14. A method as in claim **13**, wherein the high frequency energy is applied at a level and for a time sufficient to necrose substantially all tissue between said electrode members without causing substantial damage to other tissue.

15. A method as in claim **14**, wherein the high frequency energy has a frequency from 100 kHz to 1 MHz, a power level from 25 W to 200 W, and is applied for a time from 5 seconds to 5 minutes.

16. A method as in claim **13**, wherein the electrode members are laterally spaced-apart by a distance in the range from 0.5 mm to 10 mm.

17. A method as in claim **13**, wherein the electrode members have a length in the range from 5 mm to 30 mm and a width from 0.5 mm to 5 mm.

18. A method as in claim **13**, wherein both electrode members are on the same jaw.

19. A method as in claim **13**, wherein the first electrode member is on one jaw and the second electrode member is on the other jaw.

20. A method as in claim **13**, wherein at least one of the electrode members comprises a plurality of tissue penetrating elements which project toward the opposed jaw.

21. A method as in claim **19**, wherein the tissue penetrating elements have a length from 1 mm to 6 mm and a diameter in the range from 0.1 mm to 1 mm.

22. A method as in claims **21**, wherein the first and second electrode members each comprise from 5 to 20 tissue-penetrating elements.

23. A method as in claims **20**, wherein the tissue penetrating elements are arranged in two straight lines which are parallel to each other when the jaws are closed over the tissue.

24. A methods as in claim **20**, wherein the energy is further applied between a third electrode member aligned with the first electrode member but disposed on the other jaw and a fourth electrode member aligned with the second electrode member but disposed on the other jaw.

25. A method as in claim **13**, wherein at least one of the jaws is perforated to permit the release of steam during use.

26. A bipolar surgical instrument comprising:

a shaft having a proximal end and a distal end;

a pair of opposed jaws at the distal end of the shaft;

a first electrode member on one of the jaws;

a second electrode member on one of the jaws, wherein the first and second electrode members are electrically isolated from each other;

a third electrode member aligned with the first electrode member but disposed on the other jaw and a fourth electrode member aligned with the second electrode member but disposed on the other jaw; and

an actuating mechanism for moving the jaws between an opened and closed configuration, wherein electrode members lie parallel to and laterally spaced-apart from each other when the jaws are closed.

6,030,384

**9**

**10**

27. A bipolar surgical instrument as in claim 26, wherein the electrode members are laterally spaced-apart by a distance in the range from 0.5 mm to 10 mm.

28. A bipolar surgical instrument as in claim 26, wherein the electrode members have a length in the range from 5 mm to 30 mm and a width from 0.5 mm to 5 mm.

29. A bipolar surgical instrument as in claim 26, wherein electrode members are on the same jaw.

30. A bipolar surgical instrument as in claim 26, wherein the first electrode member is on one jaw and the second electrode member is on the other jaw.

31. A bipolar surgical instrument as in claim 26, wherein at least one of the electrode members comprises a plurality of tissue penetrating elements which project toward the opposed jaw.

32. A bipolar surgical instrument as in claim 26, wherein both electrode members comprise a plurality of tissue penetrating elements which project toward the opposed jaw.

33. A bipolar surgical instrument as in claim 31, wherein the tissue penetrating elements have a length in the range from 1 mm to 6 mm and a diameter in the range from 0.1 mm to 1 mm.

34. A bipolar surgical instrument as in claim 32, wherein the first and second electrode members each comprise from 5 to 20 tissue-penetrating elements.

35. A bipolar surgical instrument as in claim 34, wherein the tissue-penetrating elements are arranged in two straight lines which are parallel to each other when the jaws are closed over tissue.

36. A bipolar surgical instrument as in claim 26, wherein at least one of the jaws is perforated to permit the release of steam during use.

37. A bipolar surgical instrument as in claim 26, wherein the actuating mechanism comprises scissors, a camming mechanism, or a linear/pivot actuator.

38. A bipolar surgical instrument comprising:

a shaft having a proximal end and a distal end;

a pair of opposed jaws at the distal end of the shaft;

a first electrode member on one of the jaws;

a second electrode member on one of the jaws, wherein the first and second electrode members are electrically isolated from each other;

wherein at least one of the jaws is perforated to permit the release of steam during use; and

an actuating mechanism for moving the jaws between an opened and closed configuration, wherein electrode members lie parallel to and laterally spaced-apart from each other when the jaws are closed.

39. A bipolar surgical instrument as in claim 38, wherein the electrode members are laterally spaced-apart by a distance in the range from 0.5 mm to 10 mm.

40. A bipolar surgical instrument as in claim 38, wherein the electrode members have a length in the range from 5 mm to 30 mm and a width from 0.5 mm to 5 mm.

41. A bipolar surgical instrument as in claim 38, wherein electrode members are on the same jaw.

42. A bipolar surgical instrument as in claim 38, wherein the first electrode member is on one jaw and the second electrode member is on the other jaw.

43. A bipolar surgical instrument as in claim 38, wherein at least one of the electrode members comprises a plurality of tissue penetrating elements which project toward the opposed jaw.

44. A bipolar surgical instrument as in claim 38, wherein both electrode members comprise a plurality of tissue penetrating elements which project toward the opposed jaw.

45. A bipolar surgical instrument as in claim 43, wherein the tissue penetrating elements have a length in the range from 1 mm to 6 mm and a diameter in the range from 0.1 mm to 1 mm.

46. A bipolar surgical instrument as in claim 44, wherein the first and second electrode members each comprise from 5 to 20 tissue-penetrating elements.

47. A bipolar surgical instrument as in claim 46, wherein the tissue-penetrating elements are arranged in two straight lines which are parallel to each other when the jaws are closed over tissue.

48. A bipolar surgical instrument as in claim 38, further comprising a third electrode member aligned with the first electrode member but disposed on the other jaw and a fourth electrode member aligned with the second electrode member but disposed on the other jaw.

49. A bipolar surgical instrument as in claim 38, wherein the actuating mechanism comprises scissors, a camming mechanism, or a linear/pivot actuator.

*    *    *    *    *